1
2
3
4
5

Dan Stormer, Esq. [S.B. # 101967]
Brian Olney, Esq. [S.B. #298089]
HADSELL STORMER RENICK & DAI LLP
128 N. Fair Oaks Avenue
Pasadena, California 91103
Telephone: (626) 585-9600
Facsimile: (626) 577-7079
Emails: dstormer@hadsellstormer.com
        bolney@hadsellstormer.com

6
7
8

Attorneys for Plaintiffs

[Additional Counsel continued on next page]

9

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

10
11
12
13

KARLA GARCIA ARANDA, an individual; ALFREDO ARANDA, an individual; and Minor Plaintiff B.A., by and through his Guardian *ad Litem*, Karla Garcia Aranda,

14                    Plaintiffs,

15        v.

16    COUNTY OF LOS ANGELES *et al.*,

17                    Defendants.

Case No. 2:19-cv-01770-RGK-RAO
[Assigned to the Honorable R. Gary Klausner– Courtroom 850]

**[PROPOSED] THIRD AMENDED COMPLAINT FOR DAMAGES**

1.  Violation of Civil Rights 42 U.S.C. § 1983 (Fourth Amendment)
2.  Violation of Civil Rights 42 U.S.C. § 1983 (Municipal Liability - *Monell*)
3.  Violation of Civil Rights 42 U.S.C. § 1983 (Fourteenth Amendment – Procedural Due Process)
4.  Violation of Civil Rights 42 U.S.C. § 1983 (Fourteenth Amendment – Substantive Due Process)

(*Supplemental Jurisdiction*)
5.  Negligence (Cal. Civ. Code §§ 1714 and 3333)
6.  Negligence *Per Se*
7.  Intentional Infliction of Emotional Distress
8.  Violation of Mandatory Duty
9.  Bane Act (Cal. Civ. Code. § 52.1)

**DEMAND FOR JURY TRIAL**

Complaint filed:     August 15, 2018
Trial Date:          March 31, 2020

[Additional Counsel continued from previous page]

Olu K. Orange, Esq. (SBN 213653)
ORANGE LAW OFFICES, P.C.
3435 Wilshire Boulevard, Suite 2910
Los Angeles, California 90010
(t) (213) 736-9900
(f) (213) 417-8800
(e) o.orange@orangelawoffices.com

Rachel Steinback, Esq. (SBN 310700)
LAW OFFICE OF RACHEL STEINBACK
P.O. Box 291253
Los Angeles, CA 90029
(t) (213) 537-5370
(f) (213) 232-4003
(e) steinbacklaw@gmail.com

Attorneys for Plaintiffs

1  COME NOW PLAINTIFFS, Minor Plaintiff B.A., by and through his Guardian

2  *ad Litem*, Karla Garcia Aranda; and KARLA GARCIA ARANDA ("Karla"), and

3  ALFREDO ARANDA ("Alfredo") (B.A., Karla, and Alfredo collectively, "Plaintiffs" or

4  "Arandas") and hereby allege as follows:

5  ## INTRODUCTION

6  1.   This action for damages arises from Minor Plaintiff B.A.'s forced

7  separation from his parents, Plaintiff Karla Garcia Aranda and Plaintiff Alfredo Aranda.

8  2.   In December 2013, B.A. and his parents were a happy family living a law-

9  abiding life in Maywood, California. Karla and Alfredo worked hard to support their son

10 and he was thriving. Alfredo, however, experienced constant harassment by local Los

11 Angeles Sheriff's Department officers who patrolled their neighborhood.

12 3.   Frustrated by the harassment, Alfredo decided to file a formal complaint

13 against the officers. The officers retaliated against Alfredo, spurring a series of events

14 that ended up tearing B.A. away from his parents and thrusting him into the foster care

15 system for almost four years while his parents fought desperately to get their son back.

16 4.   The misconduct undertaken by the Los Angeles Sheriff's Department

17 officers is stunning, and its consequences will undoubtedly be felt for the rest of B.A.'s,

18 Karla's and Alfredo's lives. Equally egregious were the actions undertaken by the

19 individuals the Arandas confronted in the foster care system. Rather than help the family

20 reunite, they punished Karla for being a "squeaky wheel" and delayed B.A.'s return to

21 his family. In doing so, they caused young B.A. to be the victim of terrible horrors,

22 including bullying, verbal abuse, physical abuse, starvation, and sexual abuse.

23 5.   Karla finally succeeded in getting her son home. The trauma, however,

24 endures. Sixteen-year-old B.A. suffers night sweats and nightmares, living with a

25 constant fear that he will be taken away again. As a result of the abuses he experienced,

26 he has been clinically diagnosed with PTSD and major depression. A sweet and gentle

27 child, he now suffers from outbursts of anger, he has been involuntarily hospitalized on

28 multiple occasions, and he experiences flashbacks to the abuse. Karla and Alfredo suffer

[PROPOSED] THIRD AMENDED
COMPLAINT                           -1-

1 tremendously watching their son suffer and living with the guilt of not having been able
2 to protect their son – even as they know they did everything they could to get him home.

3      6.     The Arandas bring this lawsuit to get justice for what happened to them, to
4 hold Defendants accountable for their egregious misconduct, and to expose the inner-
5 workings of the foster care system, in hopes that no other child, parent, or family has to
6 go through what they did.

7 **JURISDICTION AND VENUE**

8      7.     Plaintiffs bring this case pursuant to 42 U.S.C. §§ 1983, 1988.  Jurisdiction
9 is based upon 28 U.S.C. §§ 1331, 1343.  Supplemental jurisdiction exists over the state
10 claims and Defendants pursuant to 28 U.S.C. § 1367. Plaintiffs have satisfied the Tort
11 Claims Act as to California state law claims made herein.

12      8.     The claims alleged herein arose from events or omissions that occurred in
13 the County of Los Angeles.  Therefore, venue lies in the Central District of California
14 pursuant to 28 U.S.C. § 1391(b)(2).

15 **PARTIES**

16      9.     Plaintiff KARLA GARCIA ARANDA ("Karla") is a resident of Los
17 Angeles County. She is the mother of Minor Plaintiff B.A. and has been appointed his
18 guardian *ad litem* for purposes of this litigation.

19      10.     Plaintiff ALFREDO ARANDA ("Alfredo") is a resident of Los Angeles
20 County. He is the father of Minor Plaintiff B.A.

21      11.     Minor Plaintiff B.A. is a resident of Los Angeles County. When the
22 incidents giving rise to this lawsuit began, B.A. was barely eleven years old.

23      12.     Defendant COUNTY OF LOS ANGELES ("County") is a duly constituted
24 governmental entity in the State of California and is, or was, the employer of all
25 individually named Defendants including but not limited to those who are sued in their
26 individual and official capacities, as well as Defendant DOES 1 through 10.

27      13.     At all times relevant herein, Defendant social worker RUBEN JIMENEZ,
28 ("CSW JIMENEZ") was employed by Defendant COUNTY's Department of Children

and Family Services ("DCFS"), acting under color of law and within the course and scope of his employment.

14. At all times relevant herein, Defendant social worker MELISSA RAMIREZ ("CSW RAMIREZ") was employed by Defendant COUNTY's DCFS, acting under color of law and within the course and scope of her employment.

15. At all times relevant herein, Defendant social worker LYDIA BUENO ("CSW BUENO") was employed by Defendant COUNTY's DCFS, acting under color of law and within the course and scope of her employment.

16. At all times relevant herein, Defendant social worker ALEXANDRA RONCES ("CSW RONCES") was employed by Defendant COUNTY's DCFS, acting under color of law and within the course and scope of her employment.

17. At all times relevant herein, Defendant social worker ILANA LARA ("CSW LARA") was employed by Defendant COUNTY's DCFS, acting under color of law and within the course and scope of her employment.

18. At all times relevant herein, Defendant social worker GLADYS ESCOBEDO ("CSW ESCOBEDO") was employed by Defendant COUNTY's DCFS, acting under color of law and within the course and scope of her employment.

19. At all times relevant herein, Defendant social worker EVITA SALAS ("CSW SALAS") was employed by Defendant COUNTY's DCFS, acting under color of law and within the course and scope of her employment.

20. At all times relevant herein, Defendant social worker ANTONIA LOPEZ ("CSW LOPEZ") was employed by Defendant COUNTY's DCFS, acting under color of law and within the course and scope of her employment.

21. At all times relevant herein, Defendant social worker RACHEL SIMONS ("CSW SIMONS") was employed by Defendant COUNTY's DCFS, acting under color of law and within the course and scope of her employment.

22. At all times relevant herein, Defendant social worker GLORIA MEJIA ("CSW MEJIA") was employed by Defendant COUNTY's DCFS, acting under color of

1   law and within the course and scope of her employment.

2      23.    At all times relevant herein, Defendant social worker STEPHANIE

3   MORALES ("CSW MORALES") was employed by Defendant COUNTY's DCFS,

4   acting under color of law and within the course and scope of her employment.

5      24.    At all times relevant herein, Defendant social worker LAURA LUNA

6   ("CSW LUNA") was a SUPERVISING employee of Defendant COUNTY's DCFS,

7   acting under color of law and within the course and scope of her employment.

8      25.    At all times relevant herein, Defendant social worker SANDRA JIMENEZ

9   ("CSW S. JIMENEZ") was employed by Defendant COUNTY's DCFS, acting under

10  color of law and within the course and scope of her employment.

11     26.    At all times relevant herein, Defendant Sheriff PACHECO ("OFFICER

12  PACHECO") was employed by Defendant COUNTY's Sheriffs' Department, acting

13  under color of law and within the course and scope of his employment.

14     27.    At all times relevant herein, Defendant Sheriff ESPINOZA ("OFFICER

15  ESPINOZA") was employed by Defendant COUNTY's Sheriffs' Department, acting

16  under color of law and within the course and scope of his employment.

17     28.    The identities and capacities of Defendants DOE 1 through 10 are presently

18  unknown to Plaintiffs, and on this basis, Plaintiffs sue these Defendants by fictitious

19  names. Plaintiffs will amend the Complaint to substitute the true names and capacities of

20  the DOE Defendants when ascertained. Plaintiffs are informed, believe, and thereon

21  allege that DOE 1 through 10 are, and were at all times relevant herein, employees of

22  Defendant County of Los Angeles, and are responsible for the acts and omissions

23  complained of herein. Defendant County of Los Angeles is vicariously liable for their

24  actions under California Government Code § 815.2.

25                              **BACKGROUND**

26     29.    In Defendant County of Los Angeles ("County") the widespread use of

27  perjury by Department of Children and Family Services ("DCFS") social workers to

28  secure custody of hundreds of thousands of children without cause reached critical mass

in 2017. Approximately two thousand (2,000) children were removed from four thousand (4,000) parents each month - a total of seventy-two thousand (72,000) children and parents. Based on Defendant County's own records, eighty three percent (83% i.e. 1,600) of the approximately 2,000 children were never abused or neglected.

30.     DCFS warehouses these children in undisclosed locations without a trial or evidence and allows them to have very limited contact with their parents. Often, DCFS requires that the contact be monitored, stripping any privacy or comfort from the visits. Those brief visits may last only two to four hours per week, and they often take place at a fast food restaurant or in a room in a DCFS office. This forced separation of families is traumatizing, and it is leading to permanent and irreparable damage.

31.     In 2016, approximately 1,500 perjured dependency petitions were filed each month by Defendant County against 1,600 well cared for children (never abused/neglected) taken from 3,200 parents for a total 38,400 parents and 19,200 children. Court appointed attorneys routinely instructed indigent parents to abandon their due process rights to trial on the pretext that the judge did not like them or their case. Judges, in turn, rubber stamped the perjured petitions and ordered 19,200 children into foster care without trials or evidence.

32.     Each foster child brings Defendant County up to $150,000.00 per year in federal foster care funds under Title IV-E of the Social Security Act and state foster care funds. In 2017, Defendant County received an estimated $2 billion by improperly seizing an estimated 19,200 children from their parents and placing them in the foster care system.

33.     Social worker perjury has plagued Defendant County for decades. In 1995, following statewide hearings on the issue, the Legislature enacted Government Code Section 820.21 in an attempt to curb social worker perjury and the creation and use of false evidence in dependency court proceedings. The 1995 Legislative Digest documented numerous complaints of widespread perjury in dependency court proceedings. As in this case, most of those proceedings involved indigent parents who,

1    on the advice of counsel, pleaded no contest to the allegations and had their children
2    removed from their homes based on perjured statements, without evidence or trial.
3    Section 820.21 removed the immunity from suit that social workers previously enjoyed
4    under the law and allowed parents and children across California to hold social workers
5    accountable for their misconduct.

6        34.    Notwithstanding the enactment of Section 820.21, the unchecked use of
7    perjury and falsified documents by Defendant County's DCFS social workers has
8    continued to surge. In 2012, approximately nine hundred (900) children were removed
9    each month from one thousand eight hundred (1,800) parents for an estimated $1.8
10   billion in Title IV-E federal foster care funds and state foster care funds. As alleged
11   above, by 2017, the number of children removed each month surged to two thousand
12   (2,000) bringing Defendant County $2.2 billion in Title IV-E federal foster care funds.
13   (*See* California Department of Social Services, Stakeholders Report, 2002). Plaintiffs
14   herein identified hundreds of parents who also lost their children due to perjury, falsified
15   evidence, and deception, who agreed to come forward to testify that the same thing
16   happened to them that happened to Plaintiffs: that DCFS removed their children based
17   on perjury, fraud, deception, and coercion without evidence or trial. The testimony of
18   these families is consistent with the findings documented in the 1995 Legislative Digest.

19       35.    Although the financial incentives to cycle children into the foster care
20   system are substantial, they are not the only reason innocent families end up torn apart.
21   On information and belief, Defendant County's Los Angeles Sheriff's Department
22   regularly uses the dependency court system to threaten, intimidate, and punish the
23   vulnerable citizens it polices. Because the financial incentives are aligned, because of the
24   unwieldy size and bureaucracy of the system, and because of Defendant County's failure
25   to properly train and supervise its DCFS employees, social worker perjury goes largely
26   unchecked, facilitating a culture wherein social workers and case workers can act with
27   impunity, violating the rights of the men, women and children whose lives it impacts.
28   On information and belief, those violations and abuses are rampant and include many of

1    the violations and abuses suffered by the Arandas.

2        36.    The extensive trauma that results from the forced separation of families is

3    undisputed and well-documented. By way of example, California's Little Hoover

4    Commission found that the risk of abuse and neglect is ten times greater in the foster

5    care system than if children remain with their parents; that the suicide rate for children in

6    the foster care system is double what it is for the general population; and that the rates of

7    drug addiction, school drop-out, and teenage motherhood are vastly greater for youth in

8    the foster care system. (*See* The Little Hoover Report, 2005; The Little Hoover Report,

9    2002).

**California Law Prioritizes Keeping Children With their Parents and**

**Imposes Mandatory Duties that County DCFS Employees are Bound to Follow**

12       37.    The Legislative intent to protect children and preserve families is set forth

13   in Welfare and Institutions Code ("WIC") Section 202 and Section 16000 (a). Section

14   202 provides in pertinent part as follows: "The purpose of this Chapter is to provide for

15   the protection and safety of the public and each minor under the jurisdiction of the

16   juvenile court and <u>to preserve and strengthen </u>the minor's family ties whenever possible,

17   <u>removing the minor from the custody of his or her parents only when necessary </u>for his

18   or her welfare or for the safety and protection of the public.

19       38.    WIC Section 16000 (a) provides in pertinent part as follows: "It is the intent

20   of the Legislature to preserve and strengthen a child's family ties whenever possible,

21   removing the child from the custody of his or her parents only when necessary for his or

22   her welfare or for the safety and protection of the public."

23       39.    The Legislature promulgated SDM Policy and Procedures Manual, SDM

24   3.07 October 2015 (Structured Decision Making System) which imposes mandatory

25   statutory duties on social workers to assess domestic violence and substance abuse in

26   accordance with the definitions set forth in the SDM Hotline Tools Definitions, the SDM

27   Safety Assessment Definitions, and the SDM Safety Assessment Definitions.

28       40.    SDM Safety Assessment Definitions (p. 30) imposed mandatory duties on

social workers to "mark all criteria that apply" and "do not mark items if the caller's information does not reach the threshold of the definition for an item". "Appropriate Completion. Workers should familiarize themselves with the items that are included on the safety assessment and the accompanying definitions. (p. 50) What distinguishes SDM is that is ensures that every worker is assessing the same items in each case, and that the responses to these items lead to specific decisions. SDM ensures that the specific items that comprise the safety assessment are assessed at the sometime during the initial contact ... Record the date of the safety assessment. The date of assessment is typically the date that the worker made the initial face-to-face contact with the child to assess safety.

41.     SDM Hotline Tools Definitions (p. 11) imposed mandatory statutory definitions of domestic violence as follows: "incidents that occur while the child is present" and on page 12 as "[t]he child has witnessed, intervened in, or is otherwise aware of physical altercations, serious verbal threats, or intimidation between adults in the home".

42.     SDM Safety Assessment Definitions (page 38) imposed the mandatory statutory threshold definition of domestic violence as follows: "[d]omestic violence likely to injure child. There have been incidents of household violence that created danger of serious physical injury to a child AND there is reason to believe that this may occur again (e.g. alleged domestic violence perpetrator and victim are still involved in relations; a pattern of household violence continues to exist) and or a recent history of one or more physical assaults between intimate members of the household known by credible reports."

43.     The SDM Hotline Tools Definitions imposed mandatory duties on social workers to "Evaluate out: No Criteria are marked. Mark this decision if no criteria in Section A are marked, which means that the report does not meet the statutory requirements for an in-person response". (p. 19) The SDM Hotline Tools Definitions imposed mandatory duties on social workers to "mark all criteria that apply. Do not

mark items if the caller's information does not reach the threshold of the definition for an item." (p. 30)

44.     SDM Safety Assessment Definitions in Section 1: Safety Threats (p.52) imposed mandatory duties on social workers to assess critical threats in every case: "This is a list of 10 critical threats (nine identified and defined and an "other") that must be assessed by every worker in every case. These threats cover the kinds of conditions that, if they exist, would render a child in danger of immediate, serious harm."

45.     The Legislature promulgated California Department of Social Services (CDSS) Manual of Policies and Procedures (MPP) Division 31-135 to implement express Legislative intent in WIC section 16000 (a) and section 202 to protect children and preserve and strength family ties. The MPP provides in pertinent part, as follows: GENERAL 31-001 ".1 The requirements specified in Sections 31-005 through 31-525 shall be met by the county in the administration of child welfare services."

46.     MPP Division 31-135 imposed mandatory statutory duties on Defendant County and Defendant DCFS social workers to ensure that authority to remove the child exists prior to removal, as follows: "when a social worker determines that the child cannot be safely maintained in his/her own home, the social worker must ensure that authority to remove a child exists prior to removal."

47.     MPP Division 31-320.2 imposed mandatory statutory duties on Defendant County and Defendant DCFS social workers to visit the child three times during the first 30 days in foster care.

48.     MPP Division 31-320.3 imposed mandatory statutory duties on Defendant County and Defendant DCFS social workers to thereafter visit the child monthly.

49.     MPP Division 31-330 imposed mandatory statutory duties on Defendant County and Defendant DCFS social workers to have monthly contacts with the care provider.

50.     MPP Division 31-401.5 imposed mandatory statutory duties on Defendant County and Defendant DCFS social workers to place children in an appropriate licensed

or approved facility.

51.    MPP Division 31-410. 52 imposed mandatory statutory duties on Defendant County and Defendant DCFS social workers, to temporarily place children in an appropriate licensed or approved facility.

52.    Under California Health and Safety Code section 1508, a valid license for foster care is required.

53.    To "ensure that authority to remove a child [based on domestic violence and substance abuse] exists *prior* to removal" in accordance with mandatory statutory duties imposed by MPP Division 31-135, Defendant County's DCFS Policy 0070-502.10 "Child Protection Hotline" imposed mandatory duties on the Child Abuse Hotline worker to "identify the types of calls which constitute appropriate child abuse referrals pursuant to law and Structured Decision Making (SDM) Tools and to elicit the purpose of the call from the caller by allowing the caller to explain why they contacted the Department and asking pertinent follow-up questions. Continue gathering relevant information from the caller until you are able to assess whether or not a referral is warranted. [] If you determine that a referral is warranted: [] Elicit all pertinent information known to the caller that would enable you to accurately answer the questions contained in the SDM Hotline Tool decision trees and arrive at an appropriate response determination."

54.    Defendant County's DCFS Policy 0070-502.10 "Child Protection Hotline" 'Classifying Allegations' imposed mandatory duties on workers to "complete one SDM Hotline tool for each allegation."

55.    Defendant County's DCFS Policy 0070-502.10 "Child Protection Hotline" 'Classifying Allegations' imposed mandatory duties (1) on the worker to complete the SDM Hotline tool to the referral and forward to the Supervising Children's Social Worker (SCSW) and (2) on the supervising worker to "review the referral and the SDM Hotline tool used by the CSW for thoroughness and accuracy. If not, take action to correct the referral."

56.     Defendant County's DCFS Policy 0070-537.10 "Assessment of Domestic Violence" requires that a child be exposed to and or is the victim of domestic violence, and that the worker complete the Structured Decision Making Safety Assessment and Family Risk Assessment Forms.

57.     In accordance with MPP Division 31-135's mandatory duties to "ensure that authority to remove a child for physical abuse exists prior to removal", Defendant County's DCFS Policy 0070-548 "Taking Children into Temporary Custody" provides as follows: "Complete the SDM Safety Assessment within two business days of initial contact for all referrals ... 2. If one or more safety threats are present, and placement is the only protecting intervention possible, determine legal ground for detention. This requires at least one of the following: a. Parental consent; b. Exigent circumstances; c. Court order for detention d. If you don't get parental consent or exigent circumstances, contact your SCSW and start gathering information for a warrant." 3/8 Policy 0070-548.

58.     Defendant County's DCFS Policy 0300-303.15 "Writing the Detention Report" imposes additional mandatory duties on social workers as follows: "Prior to creating the Detention Report complete the following: ... Complete the SDM Safety and Risk Assessment tools." That policy also imposes mandatory duties on emergency response supervising social workers and assistant regional administrators to implement MPP Division 31-135 as follows: "Review the packet, Detention Report, and any supporting documents, including all SDM tools used".

59.     In accordance with mandatory statutory duties imposed by MPP Division 31-135 to "ensure that authority to remove a child exists prior to removal", Defendant County's DCFS Policy 0300-303.15 "Writing the Detention Report" also requires the CSW to obtain information regarding the children's medical, mental, emotional and school history and potential needs. Prior to creating the Detention Report, the CSW is required to review the on-line case records to ensure the information is recorded and correct. The ER SCSW is required to review the packet, Detention Report, any an~ all supporting documents, including all SDM tools used – and, if approved, to sign and date

the report and return the packet to the SCSW for on-line approval. The ER ARA is also required to review the packet, Detention Report, any and all supporting documents, including all SDM tools used.

60.     In accordance with mandatory statutory duties imposed by MPP Division 31-135 to "ensure that authority to remove a child exists prior to removal", Defendant County's DCFS Policy 0300-503.10 "Writing the Jurisdiction Report" requires that the report be based on an independent investigation by the social worker and that the DI CSW review the online case record and update the case record if necessary. The CSW is required to document all contacts in the Contact Notebook (Delivered Services Log) and the DI SCSW is required to review the Contact Notebook and the Jurisdiction/Disposition packet before approving the report. The ARA is also required to review the Jurisdiction/Disposition packet, including all SDM tools used, before approving the report.

### In Practice, DCFS Employees Are Not Abiding by these Regulations – and They Blatantly Disregarded Them, Repeatedly, In This Case

61.     DCFS social workers routinely fabricate "authority" to remove children maliciously by marking items as a risk on SDM Assessment tools that do not meet the SDM or DCFS definitions, by fabricating child abuse allegations in WIC section 300 petitions, and by covering up known material exculpatory evidence committed with malice for which there is no immunity under Gov't Code section 820.21.

62.     The systemic use of perjury, deception, lies, cover-up, and sometimes criminal conduct by Defendant County's DCFS employees has, on information and belief, unlawfully separated thousands of children from their parents, including Minor Plaintiff B.A. And the costs are enormous. Over the past three decades, on information and belief, Defendant County's DCFS social workers deprived families of their rights under the U.S. Constitution, the California Constitution, and California law, resulting in profound damages to the children and families and costing Los Angeles County taxpayers millions of dollars in civil judgments and settlements.

63.     In this case, Defendant DCFS social workers falsified the SDM Safety Assessments by marking risk and safety items they knew did not meet the DSM definition to secure the removal of B.A. from his parents, in clear violation of the mandatory duties imposed by CDSS MPP Division 31-001 and 31-135 and constituting felonies under Penal Code Section 115.

64.     In addition to falsified SDM Safety and Risk Assessments in violation of CDSS MPP Division 31-135, Defendant DCFS social workers also filed numerous perjured documents in dependency court, falsified evidence, concealed exculpatory evidence, and committed forgery to conceal B.A.'s placement in an unlicensed home which had been the subject of several law enforcement investigations.

65.     The Defendants in this case committed egregious acts of misconduct that forcibly tore apart an innocent family for years. The harm they caused is tremendous. To carry out their misconduct, Defendants fabricated and falsified evidence and concealed each other's misconduct, in accordance with the practices of Defendant County. They also knowingly and maliciously violated the mandatory statutory duties imposed upon them by MPP 31-135 and 31-320.2, 31-320.3, 310- 330, 31-401.5, and 31-410.52; by California Health and Safety Code section 1508 (requiring foster care providers to have a valid license); and by California Structured Decision Making (SDM) Definitions.

## **FACTUAL ALLEGATIONS**

66.     In 2013, Minor Plaintiff B.A. was a well-cared for, happy, and healthy 11-year-old boy in a child centered home with his mother and father, Plaintiffs Karla Garcia Aranda and Alfredo Aranda. Karla and Alfredo both worked to support their family. They were active, engaged, and nurturing parents, and B.A. was thriving: he loved school, played sports, and lived the carefree life of a healthy child.

67.     The Arandas lived in the City of Maywood, which was policed by the Los Angeles Sheriff's Department ("LASD"). Alfredo was regularly harassed by two LASD officers who patrolled the neighborhood; they would stop him – on the street, outside his home, when he was walking with his young son – make degrading comments to him,

and threaten to arrest him, even though there was no reason to do so. The same officers would frequently harass Karla as well, asking her why she was with Alfredo.

68.     In October 2013, tired of the harassment, Alfredo filed a formal complaint against the LASD officers, Defendant Pacheco and Defendant Espinoza (alternately, "Defendant Officers"), for inappropriate conduct.

69.     In retaliation for Alfredo's complaint, Defendant Pacheco and Defendant Espinoza reported a false domestic violence call to the DCFS Hotline on Alfredo and Karla on December 28, 2013 to secure the removal of B.A. from Alfredo and Karla's custody.

**Defendants' Fabrications and Lies Force the Arandas Into Dependency Court**

70.     Consistent with DCFS policy, the Hotline refused to open a case based an isolated incident. A DCFS social worker did, however, go to the Arandas' home as required to investigate.

71.     Karla and Alfredo vehemently denied that anything had happened in the home. B.A. also denied ever having seen any violence between his parents and said he felt safe at home with his parents. Karla and Alfredo informed the social worker that the call was retaliation for Alfredo's formal complaint and explained Defendants Espinoza and Pacheco's history of harassing them. The social worker told Karla and Alfredo that she was obligated to investigate the allegations but reassured them that one report to the Hotline would not result in their son's removal from the home.

72.     The social worker explained to Karla and Alfredo that there were certain things they could do, temporarily, for the benefit of the investigation: (1) Alfredo could move out (temporarily), and (2) Karla could enroll in domestic violence classes and counseling. Insisting on the falsity of the Defendant Officers' allegations, but terrified at the prospect of losing their 11-year-old son, they immediately obliged. Alfredo moved in with his father, and Karla enrolled in a class and counseling. Karla also agreed to enter into a Voluntary Case Plan that would place her under DCFS supervision. Karla and Alfredo were willing to do anything DCFS asked of them to make sure they did not lose

1  their son.

2      73.    On April 24, 2014, the social worker requested the call log from LASD for

3  the purported December 28, 2013 domestic violence call that Defendants Espinoza and

4  Pacheco had reported to the Hotline. The social worker was informed by LASD that

5  there was no such call.

6      74.    The Defendant Officers' harassment of the Arandas did not stop. On May 5,

7  2014, Defendants Pacheco and Espinoza reported a second false domestic violence call

8  to the DCFS Hotline – a report they claimed was based on a call received by LASD on

9  December 29, 2011.

10     75.    No such call was ever received by LASD on December 29, 2011, or at any

11  other time. Defendants Pacheco and Espinoza fabricated both reports to DCFS for the

12  sole purpose of taking Alfredo and Karla's son away from them, to send a message

13  about Alfredo's complaint.

14     76.    The same day the DCFS Hotline received the Defendant Officers' second

15  call, DCFS took 11-year-old B.A. away from his mother. It did this despite having no

16  evidence to support the Defendant Officers' fabricated statements; despite having

17  evidence (the LASD call logs) revealing the Defendant Officers' statements were lies;

18  despite the fact that Alfredo had moved out of the family home; and despite the fact that

19  Karla had voluntarily placed herself under DCFS supervision and was participating in

20  domestic violence classes and counseling.

21     77.    The decision to remove B.A. was inconsistent with DCFS written policy,

22  but wholly consistent with the way DCFS social workers routinely performed their

23  work.

24     78.    In order to justify the removal of a child from his home – a drastic measure

25  with serious implications for both the child and his family – the SDM requires evidence

26  of current, ongoing domestic violence that demonstrates a risk of harm to the child.

27     79.    Even if DCFS had credited the Defendant Officers' accounts – and, again,

28  there was no corroborating evidence permitting them to do so –the last purported

domestic violence incident the Defendant Officers reported had allegedly occurred on December 28, 2013, four months prior to B.A.'s removal from his home. Under the statutory SDM Definitions, an incident four months prior is not "current and ongoing" and does not meet the statutory definition to authorize removal under MPP 31-135.

80.     In addition, B.A. was protected under the Voluntary Case Plan his mother had entered into with DCFS; his parents were separated and had no contact, as instructed by DCFS; and a restraining order secured by the Defendant Officers against Alfredo was in full force and effect.

81.     Nevertheless, demonstrating a stunning indifference to the rights of B.A., Alfredo, and Karla, a DCFS social worker (hereinafter, Defendant Doe 1) filed a perjured WIC 300 petition and detention report on May 8, 2014, based on Defendant Espinoza and Pacheco's two fabricated domestic violence reports. At the dependency court hearing on the petition, Defendants Pacheco and Espinoza personally came to testify. Their testimony was wholly perjured and contained additional fabrications intended to paint Karla and Alfredo in a bad light.

82.     Based on the perjured testimony of Defendants Pacheco Espinoza, the court sustained the petition and made B.A. a ward of the state. The court released B.A. to Karla's custody based on the following conditions: (1) that Karla divorce Alfredo; (2) that Alfredo continue complying with the restraining order secured by Defendants Pacheco and Espinoza that forbade him to be around Karla or B.A; and (3) that Karla and Alfredo complete court-ordered programs. The court did grant Alfredo permission to have a handful of monitored visits with his son each week.

83.     Karla, Alfredo, and B.A. were devastated. They were also incensed that this could happen to them when they had done nothing wrong; when the social workers and the Defendant Officers knew that the basis for the petition was a lie.

84.     From May 8, 2014 to June 2, 2015, DCFS CSW Yvette Arroyo and her supervisor, SCSW Gandarilla, closely supervised and monitored B.A., Karla, and Alfredo. They had regularly scheduled appointments with Karla and Alfredo; they made

frequent unannounced visits to Karla and Alfredo's homes, where they had authority to (and did) search every square inch of the properties; and they visited B.A. in school to see how he was doing and to ask him about his home life. They also monitored to ensure that the family was complying with all court orders, including participation in classes and counseling. The Arandas did everything asked of them and not a single issue arose.

85. After a full year of supervision and monitoring, on June 2, 2015, CSW Arroyo and SCSW Gandarilla filed a Status Review Report in dependency court recommending that jurisdiction be terminated and that full custody be returned to Karla.

86. Among other things, CSW Arroyo specifically noted:

    a. that Karla had fully provided for B.A., even under the hardship the court imposed (Alfredo's no-contact order);

    b. that B.A. was "well cared for and actively participating in school";

    c. that Alfredo had remained actively involved in B.A.'s life and had complied with the court order requiring his visits with his son to be monitored; and

    d. that the "risk level for future abuse or neglect [was] LOW" – a conclusion reached through assessments conducted independently by both CSW Arroyo and her supervisor, SCSW Gandarilla.

87. Unfortunately, the June 2, 2015 court hearing to terminate the court's jurisdiction was rescheduled to the following week.

88. The very next day, Karla returned home from work to find her house in disarray. A Huntington Park Police Department ("HPPD") business card was affixed to her door.

89. Karla immediately went to the HPPD station to find out what had happened. There, she learned that HPPD officers had raided her home, as well as Alfredo's parents' home (where Alfredo was living) and Alfredo's brother's home. She also learned that following the raids, the officers made a false report to DCFS stating that Alfredo was living in the home with Karla and B.A, that Alfredo was selling drugs in B.A.'s

1   presence, and that drugs were found in the cabinet in Karla's bathroom.[1]

2      90.    The officers' report was completely false. Alfredo was not living with Karla

3   and B.A. Alfredo was not selling drugs in B.A.'s presence. And Karla did not have any

4   drugs, in her bathroom or anywhere in her home. On information and belief, one or more

5   HPPD officers (Defendants Doe 2 and 3) had previously worked with the Defendant

6   Officers and effectuated the unlawful raid of Karla's home – and fabricated the false

7   police report – in order to continue the Defendant Officers' retaliatory campaign of

8   harassment against the Arandas.

9      91.    On information and belief, and to the best of Plaintiffs' recollection, after

10  the HPPD officers transported Alfredo to the police station, one or more HPPD officers

11  made comments about B.A.'s pending DCFS case to Alfredo during his interrogation,

12  and specifically mentioned one of the Defendant Officers' names.

13     92.    On June 4, 2015, DCFS received the HPPD report.

14     93.    On June 5, 2015, DCFS investigator Defendant Ruben Jimenez and

15  Defendant CSW Melissa Ramirez were assigned to investigate the HPPD report.

16     94.    Karla informed Defendant CSW Jimenez that the drugs that had

17  (purportedly) been found were <u>not</u> found in her home. She told Defendant CSW Jimenez

18  and Defendant CSW Ramirez that the photographs of the alleged drugs were not of her

19  bathroom; that they were pictures of the bathroom in her brother in-law's home – a

20  bathroom that looked drastically different than her own. She implored them to inspect

21  and photograph her bathroom and to go look at her brother in-law's home so that they

22  could see for themselves that she was telling the truth. Neither Defendant CSW Jimenez

23  nor Defendant CSW Ramirez conducted any such investigation.

24

25  [1] HPPD took photographs allegedly depicting the location where drugs were found. Even if drugs were
    found where the HPPD claimed, the photographs were of a bathroom in Alfredo's *brother's* apartment
26  – not Karla's apartment. Karla told this to the HPPD officers who showed her the photos. It was
    obvious because (1) the tile in the photographed bathroom was different from hers, and (2) the
27  bathroom in the photograph was full of diapers – and Alfredo's brother had a baby. Karla had only
    B.A., who at that time was 12 years old. There were no diapers in Karla's bathroom, or anywhere in her
28  home.

95.     Karla also told Defendant CSW Ramirez and Defendant CSW Jimenez that she had just gone through an entire year of intensive DCFS supervision, brought on by fabricated LASD reports, and that she and their family had passed with flying colors. She explained the entire background and implored them to go talk to CSW Arrollo and SCSW Gandarilla.

96.     On information and belief, Defendant CSW Ramirez did speak with SCSW Gandarilla, who verified that Karla had complied with all court ordered programs, that Karla had an appropriate support system, that she saw no drugs or drug use whatsoever in Karla or Alfredo's homes, that Alfredo was not residing in Karla's home, and that Alfredo had maintained monitored visits with B.A. and had a good and healthy relationship with his son.

97.     Defendant CSW Ramirez also would have known from the Status Review Report filed on June 2, 2015 that CSW Arroyo and SCSW Gandarilla had concluded B.A. was "well cared for and actively participating in school," and that they had independently recommended that the court terminate supervision and restore full custody of B.A. to Karla.

98.     Defendant CSW Ramirez disregarded all this information. On June 15, 2015, she instead asked the dependency court to remove B.A. from his home. In her Request for Removal Order, Defendant CSW Ramirez falsely swore there was probable cause to believe that continuance in the home of his parents was contrary to B.A.'s welfare.

99.     Three days later, Defendant CSW Ramirez, Defendant CSW Ilana Lara, and Defendant SCSW Lydia Bueno seized B.A. from Karla's custody. They had no warrant or legal basis to take him from his family.

100.    One week later, Defendant CSW Ramirez and Defendant SCSW Lydia Bueno filed a perjured detention report that swore Karla failed to protect B.A. from Alfredo's drug abuse in the home. This was false and knowingly based on fabrications.

101.    Defendant CSW Alexandra Ronces filed a WIC Section 300 petition under

[PROPOSED] THIRD AMENDED COMPLAINT

-19-

1   penalty of perjury on the same day, based on the perjured detention report. The court

2   sustained the perjured petition.

3   ### **B.A., Karla, and Alfredo Suffer Horrors in the Foster Care System**

4   102.   At twelve years old, B.A. was torn away from his parents. This family

5   separation, like so many caused by DCFS, was unlawful and was done for improper

6   motives. Predictably, the consequences were tragic.

7   103.   Young B.A. spent the first few nights after his removal at temporary

8   shelters. His parents were not allowed to know where he was.

9   104.   On or about June 20, 2015, Defendants CSW Lara and CSW Ramirez took

10   12-year-old B.A. to live with a DCFS-approved foster family. Understandably, B.A. had

11   a difficult time: he felt extremely sad, missed his parents, cried, and asked to be allowed

12   to call his mom and dad. Rather than respond with tenderness, sympathy or support, the

13   foster family ostracized him: they mocked him, called him names, and mistreated him.

14   He was forced to sleep in a room with no lights, which made him scared at night. To

15   punish him for being sad, he was not allowed to eat meals with the family. On one

16   occasion, the family went to a restaurant and left B.A. in the car while they ate. B.A.

17   began to get headaches while there, but when he complained, they would ignore him or

18   tell him words to the effect of "stop being a little girl."

19   105.   B.A. relayed all of this to his social workers, Defendant CSWs Lara and

20   Ramirez. On one occasion, as he was talking to them on the phone, the eldest daughter

21   in the foster family called him derogatory names loud enough so that the CSWs could

22   hear. Defendant CSWs Lara and Ramirez did nothing to help him.

23   106.   B.A. also relayed these accounts to his mother. Distraught by what her

24   young son was going through, Karla called Defendant CSWs Lara and Ramirez and

25   pleaded with them to do something to help her son. Instead, Defendant CSWs Lara and

26   Ramirez began restricting Karla's calls with B.A.

27   107.   Fortunately, the foster family ultimately decided they no did not want to

28   "care" for B.A. Twelve-year-old B.A. was again taken to a temporary shelter. Shortly

[PROPOSED] THIRD AMENDED
COMPLAINT

thereafter, Defendant CSW Lara placed B.A. in the home of Martha Urbina.

### **Defendants Place B.A. in an Unlicensed Home Where He is Sexually Abused and then Work Together to Cover Up Their Misconduct**

108. Urbina was not licensed or certified for foster care, and never had been. According to public records, a day care license she had once received had been revoked by the State in January 2015. She had no DCFS provider number and in no way satisfied any of the requirements that would have authorized DCFS to place a foster child in her custody. B.A. never should have been placed in her home.

109. Defendant CSW Lara placed B.A. there anyway.

110. Defendant CSW Lara documented only one in-person meeting with Urbina in a DCFS contact log. That entry contains falsified information regarding Urbina's name, address, and licensing.

111. On June 29, 2015, Defendant CSW Lara had Urbina sign a DCFS document entitled "Agency-Relative Caregiver Placement Agreement" which stated that Urbina was a non-relative extended family member ("NREFM"). This was false, and Defendant CSW Lara knew it. No one in the Aranda family had ever met or heard of Urbina before Defendant CSW Lara placed B.A. in Urbina's home.

112. Other than that Agency-Relative Caregiver Placement Agreement signed by Urbina, there is no record of B.A.'s placement with Urbina. There is no fingerprint clearance. There was no facility approval. There was no provider number.

113. Defendant CSW Lara knew when she placed B.A. with Urbina that placement with an unlicensed individual was illegal and violated mandatory statutory duties: (1) California Community Care Licensing (CCL) had never issued Urbina a foster care license; (2) CCL had revoked Urbina's day care license in January 2015; (3) Defendant never signed a foster parent agreement with Urbina; (4) Defendant never cleared B.A.'s placement with DCFS's Central Placement Unit, in violation of DCFS written procedures; (5) DCFS's Central Placement Unit did not place B.A. with Urbina, in violation of DCFS written procedures; and (6) DCFS's Central Placement Unit has no

record of B.A.'s placement with Urbina, in violation of state law and DCFS written procedures.

114.     Defendant CSW Lara's actions were unlawful and inconsistent with DCFS written policies and procedures, but were wholly consistent with the practices that DCFS social workers routinely engaged in. Predictably, they seriously endangered B.A.'s health, welfare and safety.

115.     During B.A.'s placement in Urbina's home, he was subjected to maltreatment, abuse and violence. Just twelve years old, he was repeatedly sexually abused by a woman (Urbina) more than forty years his senior.

116.     The composition of the apartment should have raised red flags for Defendant CSW Lara: Urbina and her husband slept in one room; her son, her son's wife, and their six children slept in another room; and B.A. was left to sleep in the living room. There was one bathroom for the eleven occupants of the apartment, and it contained no hot water.  Knowing all of that, Defendant CSW Lara left B.A. there. On information and belief, Defendant CSW Lara did not document any of this.

117.     Urbina told Karla that she would need Karla to bring food and drink if she wanted B.A. to eat. She also began attempting to extort Karla, telling Karla that she would use B.A.'s social security number unless Karla paid her money. Karla reported all of this to Defendant CSW Lara and, later, to Defendant CSW Gladys Escobedo.

118.     Defendant CSW Lara dismissed Karla's complaints, telling Karla, in sum and substance, "That's not true. We know her. She's been a foster mother before and no one has ever complained." This was a lie. Urbina had never been a foster mother. Karla was telling the truth.

119.     Defendant CSW Escobedo told Karla, in sum and substance, that she shouldn't worry, that Urbina couldn't do anything, and that she (Escobedo) would look into it. This was untrue. Defendant CSW Escobedo never made any investigation into Karla's reports.

120.     Knowing all of this, Defendants CSW Lara and CSW Escobedo left B.A.

1   there. On information and belief, neither Defendant ever documented any of this.

2       121.   Worried for the safety and security of her son, Karla supplemented the

3   home with food and drink for B.A. and sent a $250.00 (two hundred fifty dollar)

4   cashier's check to Urbina, as she had demanded. It was all Karla could scrimp together.

5       122.   Approximately three weeks after B.A. was placed at Urbina's, the police

6   were called to the home because of a domestic violence incident between Urbina and her

7   adult son. The two had fought and Urbina wielded a knife at her son. There was a full

8   police investigation and a finding by another DCFS social worker that the grandchildren

9   in the house should never be left alone with Urbina. Knowing all of that, Defendant

10  CSW Lara left B.A. there. On information and belief, Defendant CSW Lara did not

11  document any of this.

12      123.   Despite documented, substantiated domestic violence in an unlicensed,

13  unsupervised and unmonitored home, 12-year-old B.A. was not removed from Urbina's

14  home.

15      124.   As time passed, Karla became increasingly concerned about the conditions

16  B.A. was being subjected to. She repeatedly voiced those concerns to Defendant CSW

17  Lara and Defendant CSW Escobedo. They continued to dismiss her and call her a liar.

18  On information and belief, neither Defendant CSW Lara nor Defendant CSW Escobedo

19  documented any of Karla's complaints.

20      125.   Young B.A., too, reported his concerns to Defendant CSW Lara.

21  Embarrassed and unsure, he shared with Defendant CSW Lara some of the inappropriate

22  sexual things that Urbina was having him do. Defendant CSW Lara dismissed his

23  concerns, told him he was overreacting, and left him in the home. On information and

24  belief, Defendant CSW Lara did not document any of B.A.'s concerns.

25      126.   On or about July 21, 2015, a DCFS emergency response social worker,

26  Tanya Russell, went to the Urbina home to investigate the domestic violence incident.

27  At the home, Ms. Russell discovered B.A. locked in a room. Ms. Russell asked him who

28  he was and why he was there and learned that he had been placed in that (supposed)

foster home. Ms. Russell reported that according to her DCFS records, no foster children were shown to be in the home. Ms. Russell contacted the assigned supervisor (SCSW) on B.A.'s case to convey the information. The supervisor instructed Defendant CSW Escobedo to immediately remove B.A. and to transport him to the home of a family friend, Josephina Rendon, who resided at 4542 E. 53rd Street, Bell, CA.

127.   Defendant CSW Escobedo created documents reflecting the transfer. Those documents, however, were false. She did not remove B.A. as directed. B.A. was left to suffer significant abuse and neglect in Urbina's home for more than two more months.

128.   Between July 21, 2015 (the date she was ordered to take B.A. out of Urbina's home) and October 1, 2015 (when she finally took B.A. out of Urbina's home and to Ms. Rendon's home), Defendant CSW Escobedo repeatedly created false documents to hide the fact that B.A. was still residing in an unlicensed, unsupervised home. Among them were:

      a. a July 31, 2015 Contact Log report detailing face-to-face contact she had with B.A. and Ms. Rendon at Ms. Rendon's home that day, which had not occurred;

      b.  a July 31, 2015 "Relative Caregiver Agreement" on which she forged Ms. Rendon's signature and mis-identified Ms. Rendon's address;

      c. an August 5, 2015 Contact Log report detailing face-to-face contact she had with B.A. and Ms. Rendon at Ms. Rendon's home that day, which had not occurred; and

      d. an August 19, 2015 Contact Log report detailing face-to-face contact she had with B.A. and Ms. Rendon at Ms. Rendon's home, which had not occurred.

129.   Defendant CSW Escobedo also enlisted colleagues to help cover up her failure to immediately remove B.A. from Urbina's home. Those colleagues bolstered her false paper trail by fabricating additional documents, including but not limited to the

following:

  a. an August 14, 2015 Contact Log report authored by Defendant CSW Jimenez detailing face-to-face contact he had with B.A. and Ms. Rendon at Ms. Rendon's home, which had not occurred;

  b. an August 20, 2015 false jurisdiction/disposition report authored by Defendant CSW Jimenez and Defendant SCSW Rachel Simons stating that B.A. was living with Ms. Rendon, which was not true; and

  c. a further fabrication in the August 20, 2015 jurisdiction/disposition report in which Defendant CSW Jimenez detailed a face-to-face contact he had with B.A. and Karla at Ms. Rendon's home, which had not occurred.

130.   Defendants Lara, Escobedo, Jimenez and Simons went to great lengths and committed serious misconduct to cover up the fact that they had kept B.A. in an unlicensed, unsupervised home. The reason they could be so brazen was because the practice was widespread among social workers at DCFS, and they knew they would not get caught.

131.   Karla refused to remain silent as these lies were presented to DCFS and to the dependency court. In response, the Defendants painted her as a crazy liar. She was repeatedly told by the Defendants – and the court personnel who blindly believed them – that she needed to, in essence, stop her complaining and "learn how to get along." But Karla was outraged about what she and her family were being put through, terrified about what was happening to her son, and frustrated at the powerlessness of her position.

132.   Defendants Lara, Escobedo, Jimenez and Simons were lying. B.A. had not been taken out of the Urbina home in July, as ordered. In addition to the firsthand accounts of Karla, Alfredo, B.A., Ms. Rendon, and Ms. Rendon's family members and friends, undermining the Defendants' fabricated reports are records from doctor's appointments B.A. had through the end of September 2015 *signed by Urbina* and listing

1    her as B.A.'s caretaker.

2        133.   Karla finally succeeded in getting B.A. out of Urbina's home and into the

3    home of her longtime friend, Ms. Rendon, on or about October 1, 2015. What she hoped

4    would be a quick resolution of the dependency case and her son's speedy return home

5    did not, however, materialize.

6    **Defendants Retaliate Against Karla, Prolonging the Unlawful Separation and**

7    **Exacerbating the Harms Experienced by B.A., Karla and Alfredo**

8        134.   Karla's "complaining" about the Defendant CSWs had made her a target,

9    and they continued to make her life miserable. In so doing, they exposed B.A. to even

10   more trauma and harm.

11       135.   When B.A. moved to Ms. Rendon's home, he was assigned new DCFS

12   social workers: Defendants CSW Evita Salas and SCSW Antonia Lopez. On information

13   and belief, they had heard about Karla's vocal advocacy for her family – and her

14   critiques of their colleagues – and it was clear they did not appreciate them.

15       136.   Karla told Defendants CSW Salas and SCSW Lopez that Urbina was

16   continuing to harangue her; that Urbina was continuing to try to extort Karla. Defendants

17   CSW Salas and SCSW Lopez told Karla she was crazy and lying and they did nothing.

18       137.   In fact, Urbina had stolen personal checks from Karla and was threatening

19   to cash them. Defendants CSW Salas and SCSW Lopez did not document any of this.

20       138.   One of the court-ordered conditions imposed on Karla was that she

21   complete a domestic violence class. Karla was required to present proof of her

22   enrollment in, her participation in, and her completion of that class to Defendants CSW

23   Salas and SCSW Lopez, and she did. Defendants CSW Salas and SCSW Lopez did not,

24   however, present that information to the court. Instead, in their reports to the court, they

25   lied and said Karla was not in compliance.

26       139.   Karla's lawyer told Karla there was nothing she could do; that the court

27   would only consider documentation from the DCFS social workers as verified proof of

28   Karla's attendance at the class.

[PROPOSED] THIRD AMENDED COMPLAINT                    -26-

140.   Karla complained about Defendants CSW Salas and Lopez's actions to DCFS and to the court clerk, but that only made Defendants punish her further. By way of example:

    a.   As required by DCFS, Defendant CSW Salas provided Karla with bus passes so Karla could get to her court-ordered classes and appointments. The bus passes Defendant CSW Salas gave her, however, never had any money on them. Karla reported this to Defendant CSW Salas, who simply scoffed.

    b.   As required by the court, Karla went regularly to get drug tested. However, frequently when she would appear for the test she would be told that her name was not on the list; that the social workers assigned to her case (Defendants CSW Salas and SCSW Lopez) had not alerted the testing site that Karla was supposed to be tested. Because of that, the testing site would not test Karla. Knowing it was entirely their doing, Defendants CSW Salas and SCSW Lopez would then, in their reports to the court, state that Karla was not undergoing the drug tests and that she was failing to comply with the court's order.

    c.   Defendants CSW Salas and SCSW Lopez continued to make false reports to the court that Karla was not participating in domestic violence classes and failed to present the certificates Karla was giving them to the court. In the end, Karla completed three separate domestic violence courses before Defendants CSW Salas and SCSW Lopez finally reported to the court that Karla had, at last, complied.

141.   Karla complained vehemently about the Defendants' conduct to DCFS and to the court. She pointed out every lie in each of the Defendants' reports and repeatedly requested to be assigned new social workers. Those lies, after all, were consequential: they were prolonging her separation from her child and exposing her son to more harm.

142.    As Karla refused to remain silent, Defendants' retaliation intensified.

143.    On October 14, 2016, Defendants CSW Salas and SCSW Lopez filed a perjured detention report falsely claiming that Ms. Rendon had violated court orders, that B.A. had been living with his parents, and that B.A. was at risk of serious physical harm, damage and danger and needed to be removed from Ms. Rendon's home.

144.    These were all lies, intended to punish Karla for her complaints.

**Defendants Continue to Retaliate Against Karla, Exposing B.A. to Further Harms**

145.    On October 14, 2016, CSW Jimenez filed a perjured WIC 387 petition parroting the falsities in Defendants CSW Salas and SCSW Lopez's detention report. Defendants CSW Salas and SCSW Lopez went to court to personally ask the court not just to remove B.A. from Ms. Rendon's home, but to not allow him to be re-placed in the home of any of Karla's family or friends.

146.    This was outrageous, vindictive conduct that had nothing to do with (and was, in fact, contrary to) B.A.'s welfare.

147.    Based on the fabrications in the Defendants' reports, and at the Defendants' request, the court ordered that B.A. be removed from Ms. Rendon's home. After court, Defendant CSW Salas sent Karla a text, taunting her.

148.    Between October 2016 and March 2017, B.A. was cycled through shelters, group homes, and foster homes. He became noticeably depressed, which was reported to his social worker, Defendant CSW Gloria Mejia. Defendant CSW Mejia did nothing.

149.    In the foster home where he was placed in March 2017, an older foster child began to bully him. The kid would come into 14-year old B.A.'s room at night to bother him after everyone was asleep; he stole B.A.'s belongings; and one night, he went into B.A.'s room and molested him.

150.    B.A. reported all of this to Defendant CSW Mejia. She told him to stop complaining and called him a liar.

151.    Desperate, B.A. ran away from the foster home.

152.    Huntington Park Police Department officers were immediately sent to

Karla's home. They ransacked it and accused her of knowing where her son was. A frantic and terrified Karla had no idea where her young son was. Afraid for his safety, she immediately called a television station and asked them to help her find her missing child.

153.   B.A. ultimately turned himself in to the police. He begged to be allowed to return home to his mom and dad. Instead, Defendant CSW Mejia took him to a group home.

154.   At that group home, B.A. was surrounded by older teenagers. The youngest of the group and the only Latino kid, B.A. was bullied. He told his mom and Defendant CSW Mejia, but she did nothing.

155.   Soon thereafter, one of the kids punched B.A., giving him a black eye. Karla, seeing what had happened to her son, called Defendant CSW Mejia and begged her to go talk to B.A., to see for herself what was going on. Karla also complained to Defendant CSW Irma Silva about what was happening. Defendant CSW Silva went out to speak with B.A. She accused him of having given himself the black eye and did nothing.

156.   Ultimately, B.A. again ran away.

157.   This time, police officers found him. Defendant CSW Mejia took him to another foster home and threatened him with serious consequences if he ever ran away again.

158.   Defendant CSW Mejia also restricted Karla's ability to communicate with her son. Karla begged to have visits and phone calls with her son but was largely denied.

159.   At that foster home, B.A. was given so little food that he lost weight. He was forced to sleep on a dirty floor where cockroaches and bugs crawled. When he told Defendant CSW Mejia that he was afraid to sleep on the floor and was getting bitten by the bugs, she told him to stop complaining.

160.   B.A. developed obvious signs of anxiety and distress. His headaches worsened and he began going to the bathroom in his pants.

161.   Without asking or informing Karla, and (on information and belief) without getting a doctor's prescription for B.A., Defendant CSW Mejia brought B.A. psychotropic drugs and directed him to take them daily.

162.   In May 2017, desperate and having exhausted every other option, Karla was finally able to reach a regional administrator at DCFS. During a multi-hour meeting attended by many of the Defendant social workers, she shared her horrific experiences with the administrator. She told the administrator all she had done to get her son back, and the endless and vindictive delays that had resulted in their continued separation. The administrator listened.

163.   Later that day, Karla filed a WIC 388 petition asking the court to reinstate family reunification and to order B.A.'s release to her custody. The Defendant social workers informed the court that DCFS would support Karla's petition to reunify her with her son.

164.   Between May 2017 and October 2017, Karla, Alfredo and B.A. were permitted to be in significantly greater contact. However, even as they supported Karla's petition, the Defendants continued their fabrications and lies. In a June 15, 2017 report to the court, Defendant CSW Gloria and Defendant SCSW reiterated their lies about the timing of B.A.'s placements with Urbina and Ms. Rendon.

165.   On October 9, 2017, B.A. was finally released to his mother. The dependency court closed the case and terminated jurisdiction on October 12, 2017.

## **DAMAGES**

166.   Minor Plaintiff B.A. suffered significant damages as a result of the Defendants' misconduct. At the tender age of 11, he was forcibly removed from his parents, whom he loved and was incredibly close to, and was kept away from them for nearly four years. During that time he was placed in shelters, group homes, and foster homes where he experienced verbal and physical abuse, where he was forced to live in squalor and did not have his basic needs provided for, where he was forcibly medicated, and where he was sexually molested by another teenager and sexually abused,

1   repeatedly, by an adult.

2       167.   Minor B.A. fell behind in school, developed headaches and other physical

3   ailments, and suffered tremendous anxiety, fear, hopelessness, and depression. He

4   continues to experience many of these, and suffers from post-traumatic stress disorder,

5   an inability to focus and concentrate, trouble sleeping, and severe and profound

6   emotional and mental distress.

7       168.   Plaintiffs Karla and Alfredo suffered tremendously as well because of

8   Defendants' egregious misconduct. They had their only child, their beloved young son,

9   torn away from them unlawfully. And despite their tireless fights to get him back,

10  despite Karla's relentless and zealous advocacy, they were powerless. Worse: their

11  advocacy was punished. As a result of the acts and omissions alleged herein, Karla and

12  Alfredo suffered the unspeakable pain of being forcibly separated from their child and

13  experienced tremendous stress, anxiety, fear, hopelessness, depression, PTSD, an

14  inability to focus and concentrate, sleeplessness, and severe and profound emotional and

15  mental distress, all of which continues to this day.

16  **EXHAUSTION OF ADMINISTRATIVE REMEDIES**

17      169.   Plaintiffs filed a Notice of Tort Claim with the County of Los Angeles on

18  January 16, 2018, and an Amended Notice of Tort Claim on January 31, 2018 pursuant

19  to Cal. Gov't Code § 910 et seq. On February 15, 2018, the County denied those claims.

20  **FIRST CLAIM FOR RELIEF**

21  **42 U.S.C. § 1983 – FOURTH AMENDMENT**

22  **(By Minor Plaintiff B.A. against COUNTY OF LOS ANGELES,**

23  **DCFS Defendants MELISSA RAMIREZ, LYDIA BUENO, ALEXANDRA**

24  **RONCES, RUBEN JIMENEZ, and ILANA LARA, Defendant Officers PACHECO**

25  **and ESPINOZA, and DOES 1-3)**

26      170.   Plaintiffs repeat, re-allege and incorporate all paragraphs, as though fully

27  set forth herein.

28      171.   As alleged in greater detail above, Defendants Pacheco and Espinoza made

[PROPOSED] THIRD AMENDED COMPLAINT                    -31-

a knowingly false report about domestic violence in the Aranda household to the DCFS Hotline in December 2013, after they learned Plaintiff Alfredo Aranda had filed a formal complaint against them with their employer, the Los Angeles Sheriff's Department ("LASD"). Defendants Pacheco and Espinoza made that false report intending that it would lead to to B.A.'s removal from his parents' home.

172. Pursuant to DCFS policy, a single call does not permit the removal of a child from his parents' home. Accordingly, in May 2014, Defendants Pacheco made a second knowingly false report about domestic violence in the Aranda household to the DCFS Hotline, purportedly about a call that had been received by LASD in September 2011. No call had ever been received about the Arandas in September 2011, and Defendants Pacheco and Espinoza knew it. They made that false report intending that it, combined with their earlier false report, would lead to B.A.'s removal from his parents' home.

173. Despite having no evidence to support the Defendant Officers' calls, and despite the evidence refuting their reports, DCFS Defendant Doe 1 filed a perjured petition in dependency court stating that B.A. needed to be removed from his parents' home. Acting on the fabricated information before it, the court granted the order.

174. As a result of the misconduct of Defendants Pacheco, Espinoza, and Doe 1, B.A. was unlawfully seized in violation of his rights under the Fourth Amendment.

175. One year later, when custody was on the verge of being returned to Karla, Defendants Doe 2 and Doe 3 fabricated information to falsely implicate Karla and Alfredo in criminal wrongdoing. Defendants Doe 2 and Doe 3 knew the information was false, but they reported the information to DCFS in order to ensure that B.A. be physically removed from his house and that he remain a ward of the court.

176. Acting on information they knew or should have reasonably known to be false and fabricated, and in a stunning failure to investigate even basic details that would have proved the Defendants' lies and exonerated Karla and Alfredo, Defendants Ramirez, Bueno, Jimenez, and Lara effectuated an unlawful, warrantless seizure of B.A.

from his parents. In doing so, Defendants also willfully ignored evidence of Karla and Alfredo's innocence.

177.   Defendants Ramirez and Bueno falsified SDM Assessments in violation of MPP 31-001, 31-135, and Penal Code § 115 to maintain custody of minor Plaintiff B.A. They also falsified the Detention Report, the Addendum, and the SDM Assessments, to continue in an egregious violation of Plaintiff B.A.'s constitutional rights under the Fourth Amendment.

178.   Following the warrantless seizure, Defendant Ronces filed a perjured petition in dependency court in order to remove B.A. from his parents' custody, in violation of B.A.'s Fourth Amendment rights.

179.   Defendants seized B.A. deliberately, intentionally, and with reckless or callous indifference to B.A.'s rights and safety.

180.   As a direct and proximate result of Defendants' intentional, malicious and oppressive violation of B.A.'s Fourth Amendment rights, B.A. suffered and will continue to suffer physical, mental, and emotional injuries.

181.   Defendants' actions were done pursuant to Defendant County's custom and practice of unlawfully removing minors from their parents' custody, without warrants, legal cause, or exigent circumstances that might permit a warrantless removal.

182.   Defendants' actions, customs, and/or practices, as described herein, were within the control of Defendant County and within the feasibility of Defendant County, to alter, adjust, and/or correct so as to prevent some or all of the unlawful acts and injury complained of herein by Plaintiffs.

## SECOND CLAIM FOR RELIEF
## VIOLATION OF CIVIL RIGHTS 42 U.S.C. § 1983
## MUNICIPAL LIABILITY (*MONELL*)
### (By All Plaintiffs against COUNTY OF LOS ANGELES)

183.   Plaintiffs repeat, re-allege and incorporate all paragraphs, as though fully set forth herein.

184. Defendants County violated Plaintiffs' constitutional rights, as alleged *supra*, by creating and maintaining the following unconstitutional customs and practices, *inter alia*:

i. Defendant County's standard operating procedure to use perjury to detain and traffic children into foster care in violation of their civil rights, Penal Code §§ 115, 118, and 8 U.S.C. §1621 for federal foster care funds under Title IV-E of the Social Security Act, is so widespread a practice so permanent and well settled as to constitute a custom or usage with the force of law;

ii. Defendant County's maintaining a policy or practice of detaining and/or removing well cared for children from parental custody based on falsified declarations and falsified SDM Assessments in violation of MPP 31-001, 31-135, and Penal Code section 118;

iii. Defendant County's maintaining a policy or practice of removing and detaining well cared for children from their parents without warrants and absent exigent circumstances that might other permit a warrantless removal;

iv. Defendant County's maintaining a policy or practice of improperly using the dependency court system as punishment for parents who do not blindly subject themselves to the authority of (a) law enforcement officers, or (b) DCFS employees, thereby unlawfully separating children from their parents and/or unlawfully prolonging the separation of children from their parents; and

v. Defendant County's failing to train, supervise and discipline its officers, agents, employees, and state actors, regarding the Constitutional protections guaranteed to minors and families they work with, including their rights under the First, Fourth and Fourteenth Amendments.

185.   According to the 1995 Legislative Digest, DCFS social worker perjury in Defendant County has been a pervasive problem in dependency court proceedings for decades. In 1995, following statewide hearings on the issue, the Legislature enacted Government Code Section 820.21 in an attempt to curb social worker perjury and the creation and use of false evidence in dependency court proceedings. The 1995 Legislative Digest documented numerous complaints of widespread perjury in dependency court proceedings. As in this case, most of those proceedings involved indigent parents who, on the advice of counsel, pleaded no contest to the allegations and had their children removed from their homes based on perjured statements, without evidence or trial. Section 820.21 removed the immunity from suit that social workers previously enjoyed under the law and allowed parents and children across California to hold social workers accountable for their misconduct.

186.   Despite Defendant County's awareness of its social workers' widespread use of perjury dating back decades, which has continued despite the enactment of Government Code Section 820.21 and despite the millions of dollars paid to children and parents in civil judgments for that misconduct, and despite Defendant County's awareness that it needed (and needs) to address these issues and properly train its employees, Defendant County and its employees continue to engage in the permanent, widespread, and settled custom of perjured declarations, perjured petitions, perjured detention reports, false jurisdiction/disposition reports, and false evidence, which led to the deprivation of Plaintiffs' constitutional rights.

187.   Defendant County owed duties to Plaintiffs at all times to establish, implement and follow policies, procedures, customs, and/or practices which confirmed and provided for the protections guaranteed under the United States Constitution, including the First, Fourth and Fourteenth Amendments; to use reasonable care to select, supervise, train, control, and review the activities of all of their agents, officers, employees and those acting under them, including within their law enforcement department and DCFS; and to refrain from acting with deliberate indifference to the

Constitutional rights of Plaintiffs herein so as to not to cause them the injuries and damages alleged herein.

188.   Plaintiffs specifically allege that Defendant County's policies, customs, and/or practices, as described herein, were within the control of Defendant County and within the feasibility of Defendant County, to alter, adjust, and/or correct so as to prevent some or all of the unlawful acts and injury complained of herein by Plaintiffs.

**THIRD CLAIM FOR RELIEF**

**VIOLATION OF CIVIL RIGHTS 42 U.S.C. § 1983**

**FOURTEENTH AMENDMENT (PROCEDURAL DUE PROCESS)**

**(By Minor Plaintiff B.A. against COUNTY OF LOS ANGELES,**

**DCFS Defendants MELISSA RAMIREZ, LYDIA BUENO, ALEXANDRA**

**RONCES, RUBEN JIMENEZ, and ILANA LARA, Defendant Officers PACHECO**

**and ESPINOZA, and DOES 1-3)**

189.   Plaintiffs repeat, re-allege and incorporate all paragraphs, as though fully set forth herein.

190.   As described in detail above and summarized *supra* at ¶¶ 170-177, Defendants Ramirez, Bueno, Ronces, Jimenez, Lara, Pacheco, Espinoza, and Does 1-3 knowingly fabricated and falsified reports establishing purported cause to believe that continuance in the home of his parents was contrary to B.A.'s welfare, knowing there was no cause and that their attestations were false.

191.   As a result of Defendants' actions, B.A. was unlawfully seized from his parents' home and custody.

192.   It should have been apparent to Defendants that deliberate falsification of evidence in a child abuse investigation violated B.A.'s constitutional rights and would result in the deprivation of B.A.'s Fourth Amendment right against unreasonable seizure and B.A.'s Fourteenth Amendment right not to be separated without due process of law except in emergencies.

193.   Defendants knew or should have known that B.A. had familial relationships

that their actions would impair.

194.   Defendants' acts and/or omissions as alleged in this complaint constituted interference with and deprivation of B.A.'s familial relationships and association and, as such, were violations of B.A.'s Fourteenth Amendment right to due process of law.

195.   Defendants knew or should have known that B.A. would suffer serious trauma by being forcibly separated from his parents, particularly at his young age, and that he would suffer physical, mental and emotional distress. As described in detail above, Defendants acted deliberately, intentionally, and with a reckless and/or callous indifference to B.A.'s fundamental protected rights under the Fourteenth Amendment to the U.S. Constitution. Defendants' conduct was intentional, outrageous, oppressive, and malicious.

196.   As a direct, legal and proximate result of Defendants' intentional, malicious, and oppressive conduct, B.A. has suffered and continues to suffer great emotional pain and injury, as well as loss of comfort, society and support.

197.   B.A. specifically alleges that Defendants' complained of acts and/or omissions were within each of their control, and within the feasibility of each of them, to alter, adjust, and/or correct so as to prevent some or all of the unlawful acts and injury complained of herein by Plaintiff.

## **FOURTH CLAIM FOR RELIEF**
## **VIOLATION OF CIVIL RIGHTS 42 U.S.C. § 1983**
## **FOURTEENTH AMENDMENT (SUBSTANTIVE DUE PROCESS)**
### **(By All Plaintiffs against All Defendants)**

198.   Plaintiffs repeat, re-allege and incorporate all paragraphs, as though fully set forth herein.

199.   As described in detail above, Defendants unlawfully seized B.A. from his parents' home and custody and thrust him into a foster care system where he did not belong. Once there, Defendants prolonged his unlawful separation from his parents in order to improperly punish his mother for her zealous advocacy on his behalf.

200.   Defendants effectuated this over the course of several years and in a myriad of ways, including through the fabrication and falsification of police reports, investigative reports, detention reports, and dependency court petitions; through their failure to investigate the false claims that were brought against Plaintiffs in the first instance; and through their concealment of the actual work B.A.'s mother, Karla, was doing in order to reunify with her son, and through their corresponding perjury to the court in reporting her alleged non-compliance.

201.   In removing B.A. from his parents' home and custody, they caused him to be placed in shelters, group homes, and foster homes, where he was repeatedly victimized. Tragically, despite being informed of the harms B.A. was suffering – ranging from mistreatment to starvation, placement in squalid conditions, from being subjected to verbal abuse, physical abuse, and sexual assaults – not a single Defendant moved to protect him from the harm.

202.   To the contrary, Defendants squarely placed him in harm's way. Defendants forced him to stay at facilities that they knew or should have known could not satisfy B.A.'s basic needs, including food, hot water, and sanitary conditions; they placed him in an unlicensed home, where he was exposed to domestic violence and was repeatedly sexual abused, and left him there even after being fully apprised of what was happening, instead choosing to methodically create a paper train covering up their misconduct; they left him in an unlicensed home where the designated foster parent attempted to – and did – extort B.A.'s mother, Karla; they placed him in facilities with older teenagers who bullied him, and left him in those placements after he and his mother complained about the abuse; and when he finally became so desperate as to run away, they forcibly medicated him using psychotropic medication without consulting his mother or a physician in order to render him docile, causing him to experience tremendous physical lethargy and other negative side effects. The duration, scope and extent of Defendants' misconduct is stunning. At every turn, with every complaint B.A. and his mother made, Defendants reflexively called B.A. and his mother liars, ignored

their pleas for help, failed to document any of their concerns or reports, fabricated documents to cover up their own misconduct, and punished the Aranda family by prolonging their already-unlawful separation.

203.   In all of their affirmative actions and intentional omissions, Defendants acted with deliberate indifference to the objectively substantial risk of serious harm – a harm of which any reasonable official would have been aware.

204.   As a direct, legal and proximate result of Defendants' misconduct, B.A. suffered serious harm, including physical injuries, tremendous emotional distress, and loss of familial association, comfort, and support.

205.   As a direct legal and proximate result of Defendants' misconduct, Karla and Alfredo suffered serious harm, including extreme emotional distress and loss of familial association, comfort, and support.

206.   Defendant County's policy, custom and practice of failing to adequately train and supervise its employees was the driving force behind Defendants' actions and renders Defendant County liable for the actions and omissions described, and for Plaintiffs' damages.

## FIFTH CLAIM FOR RELIEF
## NEGLIGENCE
### (By All Plaintiffs against All Defendants)

207.   Plaintiffs repeat, re-allege and incorporate all paragraphs, as though fully set forth herein.

208.   This claim is brought pursuant to California state law.

209.   Each of Plaintiffs' state law claims arise from the same nucleus of operative fact as the claims in this Complaint based upon federal law and all the claims are so closely related that this Court may properly exercise its supplemental jurisdiction over the state law claims.

210.   Defendants, and each of them, owed Plaintiff B.A. a duty of reasonable care to avoid exposing him to reasonably foreseeable risks of harm or injury by acting

1  reasonably under the circumstances complained of in this Complaint.

2      211.   Defendants, and each of them, owed Plaintiffs Karla Garcia Aranda and

3  Alfredo Aranda a duty of reasonable care to avoid exposing them to reasonably

4  foreseeable risks of harm or injury by acting reasonably under the circumstances

5  complained of in this Complaint.

6      212.   Defendants, and each of them, breached their duty of reasonable care during

7  the incidents complained of in this Complaint, by failing to act reasonably under the

8  circumstances.

9      213.   Specifically, and in summary, Defendants Pacheco, Espinoza, and Does 2

10  and 3 breached their duty to Plaintiffs by intentionally fabricating law enforcement

11  reports that they knew were likely to result in the unlawful, unjustified separation of

12  Minor Plaintiff B.A. from his parents. No reasonable law enforcement officer would

13  have conducted himself in the manner the Defendant Officers did.

14      214.    Specifically, and in summary, the DCFS Defendants breached their duty to

15  Plaintiffs by fabricating and falsifying records, documents, and reports, and by violating

16  Defendant County's written policies and protocols, in ways that they knew were likely to

17  result in the unlawful, unjustified separation of Minor Plaintiff B.A. from his parents,

18  and were likely to expose Minor Plaintiff B.A. to specific risks of harm. No reasonable

19  social worker or DCFS employee would have conducted herself in the manner the DCFS

20  Defendants did.

21      215.   As a direct, legal and proximate result of the aforementioned conduct,

22  Plaintiffs each suffered and continue to suffer great emotional pain and injury, as well as

23  loss of comfort, society and support.

24      216.   Defendants' complained of acts and/or omissions, were within each of their

25  control, and within the feasibility of each of them, to alter, adjust, and/or correct so as to

26  prevent some or all of the unlawful acts and injury complained of herein by Plaintiffs.

27      217.   Defendant County is liable to Plaintiffs for the acts of its public employees,

28  for conduct and/or omissions herein alleged, pursuant to the doctrine of respondeat

[PROPOSED] THIRD AMENDED
COMPLAINT

superior, codified at California Government Code § 815.2.

## SIXTH CLAIM FOR RELIEF

### NEGLIGENCE PER SE: VIOLATION OF CALIFORNIA DEPARTMENT OF SOCIAL SERVICES MANUAL OF POLICY AND PROCEDURE DIVISION 31-001, 31-135, 31-320.3, 31-330, 31-401.5, & CALIFORNIA STRUCTURED DECISION MAKING 3.0 SAFETY AND RISK ASSESSMENTS

**(By Minor Plaintiff B.A. against Defendants COUNTY OF LOS ANGELES, RUBEN JIMENEZ, MELISSA RAMIREZ, LYDIA BUENO, ALEXANDRA RONCES, ILANA LARA, GLADYS ESCOBEDO, EVITA SALAS, ANTONIA LOPEZ, RACHEL SIMONS, GLORIA MEJIA, STEPHANIE MORALES, LAURA LUNA, SANDRA JIMENEZ, and DOES 1 & 4-10)**

218.   Plaintiffs repeat, re-allege and incorporate all paragraphs, as though fully set forth herein.

219.   By its express provisions, California Department of Social Services (CDSS) Manual of Policies and Procedures, (MPP) Division 31 CHILD WELFARE SERVICES PROGRAM, CHAPTER 31-000 GENERAL REQUIREMENTS, imposes mandatory statutory duties on Defendant County, Defendant CDS, and Defendant social workers, as follows: GENERAL 31-001 provides in pertinent part: ".1 The requirements specified in Sections 31-005 through 31-525 shall be met by the county in the administration of child welfare services."

220.   The CDSS Manual of Policies and Procedures (MPP) Division 31-135, imposed mandatory statutory duties on Defendant County and Defendant social workers to ensure that authority to remove B.A. existed prior to removing him from the home, as follows: "When a social worker determines that the child cannot be safely maintained in his/her own home, the social worker must ensure that authority to remove a child exists prior to removal".

221.   The clear legislative intent of MPP Division 31-135 to "ensure that

authority" exists prior to taking a child from his home is to protect the fundamental liberty interest in maintaining the parent-child relationship and fundamental independent liberty interest to be part of a family unit.

222.  MPP Division 31-320.2 imposed mandatory statutory duties on Defendant County and Defendant social workers to visit the child three times during the first 30 days in foster care to ensure the child's safety and to protect the child's fundamental liberty interests.

223.  MPP Division 31-320.3 imposed mandatory statutory duties on Defendant County and Defendant social workers to visit the child monthly in foster care to ensure the child's safety and to protect the child's fundamental liberty interests.

224.  MPP Division 31-330 imposed mandatory statutory duties on Defendant County and Defendant social workers to have monthly contacts with the care provider, to ensure the child's safety and to protect the child's fundamental liberty interests.

225.  MPP Division 31-401.5 imposed mandatory statutory duties on Defendant County and Defendant social workers, to place children in an appropriate licensed or approved facility, to ensure the child's safety and to protect the child's fundamental liberty interests.

226.  MPP Division 31-410. 52 imposed mandatory statutory duties on Defendant County and Defendant social workers to temporarily place children in an appropriate licensed or approved facility to ensure the child's safety and to protect the child's fundamental liberty interests.

227.  The CDSS Structured Decision Making System (SDM), Policy and Procedures Manual SDM 3.0 October 2015, imposed mandatory duties on Defendant social workers to complete the SDM Safety and Risk Assessments on each referral and in that process, only mark conduct as a risk if the information reaches the definition for an item set forth in the SDM Definitions as follows: "Step II APPROPRIATENESS OF A CHILD ABUSEINEGLECT REPORT FOR RESPONSE. A. Screening Criteria, "Based on the caller's concerns, mark all criteria that apply. Do not mark items if the

caller's information does not reach the definition for an item." (Policy and Procedures Manual SDM 3.0, p. 30).

228.   In this case, the information concerning "domestic violence" and "substance abuse" did not meet the definition of a safety threat/risk as defined in the SDM Hotline Definitions, SDM Safety Assessment Definitions, or SDM Risk Assessments. Nevertheless, Defendants falsified the SDM Safety and Risk Assessments to manufacture a risk, and then used that falsified risk as "authority" to remove B.A., in blatant violation of the mandatory statutory duties imposed by MPP 31-001 and 31-135.

229.   Minor Plaintiff B.A. is within the class to be protected from seizure without authority in violation of MPP 31-001, 31-135 and he suffered the kind of injury MPP 31-001 and 31- 135, were enacted to prevent: his removal from his parents' custody without "authority" under Section 31-135 as defined in the statutory SDM Definitions.

230.   Defendant County placed B.A. in an unlicensed facility from June 29, 2015, to October 1, 2015 and left him there unsupervised, in violation of mandatory duties imposed by MPP Divisions 31-320.2, 31-320.3, 31-330, 31-401.5, and 31-410.52.

231.   B.A. is within the class to be protected from illegal placement in an unlicensed facility in violation of MPP Divisions 31-41 0.5 and 31-410.52, and he suffered the kind of injuries MPP divisions 31- 410.5 and 31-410.52 were enacted to prevent: placement with an unlicensed caregiver.

232.   B.A. is within the class to be guaranteed regular visits and protected from a lack of supervision, and he and suffered the kind of injuries MPP Divisions 31-320.2, 31-320.3, and 31-330, were enacted to prevent: placement with an unlicensed caregiver.

233.   As a direct and proximate result of Defendants' violation of the mandatory duties imposed by MPP 31-001 and 3-135, MPP Division 31-320.2, MPP Division 31-320.3, and MPP Division 31-330, 31-410.5 and 31-410.52, Minor Plaintiff, B.A. suffered forced separation from his family for several years, and he continuea to suffer physical, mental, and emotional injuries.

234.   Defendant County is vicariously responsible for the DCFS Defendants'

violations under Government Code § 815.21 and other applicable statutory and case law.

## SEVENTH CLAIM FOR RELIEF

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### (By All Plaintiffs against All Defendants)

235. Plaintiffs repeat, re-allege and incorporate all paragraphs, as though fully set forth herein.

236. As described in detail above, Defendants engaged in outrageous and egregious misconduct, including but not limited to the following:

    a. Defendants Pacheco and Espinoza fabricated domestic violence reports regarding the Arandas in an unlawful retaliatory act against Alfredo, who had filed a formal complaint about them with the LASD, for the specific purpose of harming the Arandas and separating Karla and Alfredo from their young son, B.A.;

    b. Defendants Doe 2 and 3 fabricated information implicating Alfredo and Karla in criminal wrongdoing, for the specific purpose of harming the Arandas and maintaining Karla and Alfredo's separation from their young son, B.A.;

    c. Defendants Ramirez, Bueno, Jimenez, Ronces, and Lara unlawfully seized B.A. from his parents' custody based on reports that Defendants knew were false;

    d. Defendants Ramirez and Bueno falsified SDM Assessments in violation of MPP 31-001 and 31-135, and Penal Code § 115, and also filed a perjured detention report to maintain custody of minor Plaintiff B.A. and unjustifiably separate him from his parents;

    e. Defendant Lara placed B.A. in an unlicensed, unsupervised home for more than three months, in violation of MPP Divisions 31-320.2, 31-320.3, 31-330, 31-410.5 and 31-410.52;

    f. Defendant CSW Ruben Jimenez and Defendant SCSW Rachel Simon

filed a falsified Jurisdiction/Disposition report to maintain custody of minor Plaintiff B.A. for federal foster care funds;

g. Defendant Evita Salas and Defendant SCSW Antonia Lopez filed falsified documents with the dependency court that prolonged B.A.'s separation from his family.

h. Defendant Evita Salas and Defendant SCSW Antonia Lopez filed a perjured detention report in order to unlawfully seize B.A. from the home of Ms. Rendon on October 14, 2016.

i. Defendant Jimenez filed a knowingly perjured WIC 387 petition against Ms. Rendon in order to unlawfully remove B.A. from her home.

j. Defendant CSW Gloria Mejia, Defendant SCSW Stephanie Morales and Defendant Laura Luna filed a falsified jurisdiction /disposition report.

237.   Defendants Jimenez, Ramirez, Bueno, Ronces, Lara, Escobedo, Salas, Lopez, Simons, Mejia, Morales, Luna, and Jimenez knew there was no immunity for said violation of mandatory statutory duties and criminal behavior under Government Code § 820.21. Defendants' acts and omissions were willful, malicious, intentional, oppressive, reckless, and/or done in willful and conscious disregard of Plaintiffs' rights, welfare, and safety, thereby justifying the awarding of exemplary and punitive damages.

238.   Defendants' continuing, coordinated, and pervasive misconduct was so extreme that it went beyond all possible bounds of decency and would be regarded as intolerable in civilized society.

239.   Defendants abused their positions of authority as Defendant County law enforcement officers and social workers and, in doing so, dramatically violated Plaintiffs' rights and interests.

240.   Defendants knew that B.A. was extremely traumatized and particularly vulnerable to emotional distress when they took him from his parents and kept him out

of their custody for several years. Defendants knew and intended for their conduct to injure B.A., and it did.

241.   Defendants knew that Karla and Alfredo were extremely traumatized and suffering tremendous emotional distress when their young son was taken away from them, and when Defendants placed increasingly greater restrictions on their access to him while simultaneously prolonging their ability to reunite with him. Defendants knew and intended for their conduct to injure Karla and Alfredo, and it did.

242.   As a direct and proximate result of Defendants' egregious, malicious, misconduct Minor Plaintiff B.A. suffered severe physical and emotional injuries and continues to suffer physical, mental, and emotional distress.

243.   As a direct and proximate result of Defendants egregious, malicious misconduct, Plaintiffs Karla and Alfredo Aranda suffered physical injuries and severe emotional distress that continue to this day.

244.   Defendant County is vicariously responsible for the actions of its agents and employees, all of whom were acting within the scope of their employment, under Government Code Section 815.21 and other applicable statutory and case law.

## EIGHTH CLAIM FOR RELIEF
## VIOLATION OF MANDATORY DUTY
**(All Plaintiffs against Defendants COUNTY OF LOS ANGELES, RUBEN JIMENEZ, MELISSA RAMIREZ, LYDIA BUENO, ALEXANDRA RONCES, ILANA LARA, GLADYS ESCOBEDO, EVITA SALAS, ANTONIA LOPEZ, RACHEL SIMONS, GLORIA MEJIA, STEPHANIE MORALES, LAURA LUNA, SANDRA JIMENEZ, and DOES 1 & 4-10)**

245.   Plaintiffs repeat, re-allege and incorporate all paragraphs, as though fully set forth herein.

246.   As detailed above, SDM 3.07, MPP 31-135, CDFS Policy 0070-502.10 and 300-303.15, WIC §§ 16000(a) and 202, and Health & Safety Code § 1508 are enactments. Enactments form the basis of a mandatory duty under California

[PROPOSED] THIRD AMENDED COMPLAINT

-46-

Government Code § 8l5.6.

247.  These enactments apply to all members of the general public, including Plaintiffs, and were all designed to prevent the kinds of injuries alleged herein.

248.  As described in greater detail above, Defendants did not exercise reasonable diligence in discharging their duty to refrain from violating the constitutional rights of Plaintiffs.

249.  As a direct and proximate cause of the aforementioned acts of Defendants, Plaintiffs were damaged in amounts to be determined at trial.

## NINTH CLAIM FOR RELIEF

## BANE ACT

**(By All Plaintiffs against Defendants PACHECO, ESPINOZA, and DOES 2-10)**

250.  Plaintiffs repeat, re-allege and incorporate all paragraphs, as though fully set forth herein.

251.  This claim is brought pursuant to California state law.

252.  Defendants Pacheco, Espinoza, and Does 2-3 violated Plaintiffs' civil rights per California Civil Code §§ 52.1 and 52(b) by (i) fabricating reports of domestic violence against the Arandas in order to unlawfully separate them from their young son, B.A., (ii) and falsely implicating Karla and Alfredo in criminal wrongdoing in order to prevent them from regaining custody of their son. Each of these acts violated Plaintiffs' rights and was retaliatory; each act was intended to threaten and intimidate the Arandas because of Alfredo's lawful filing of a citizen complaint against Defendants Pacheco and Espinoza with the Los Angeles Sheriff's Department. As such, each act and/or violation of Plaintiffs' rights carried out by Defendants Pacheco, Espinoza, and Does 2-10 was done by way of threats, intimidation and/or coercion beyond that which is inherent in each act and/or violation of rights itself because, *inter alia,* each act was additionally a violation of personal rights under Cal. Civ. Code § 43.

253.  Entity and/or agency defendants are liable to plaintiffs for the acts of their public employees. Defendant County is responsible for the misconduct and/or omissions

herein alleged against Defendants Pacheco, Espinoza, and Does 2-10 pursuant to the doctrine of respondeat superior, codified at California Government Code § 815.2.

254.   Defendants, and each of them, for the respective acts and violations pleaded herein above, are liable to each Plaintiff for damages, and penalties and attorneys' fees as provided in California Civil Code §52(b).

255.   Defendants, and each of them, for the respective acts and violations pleaded herein above, are liable to Plaintiff for attorneys' fees as provided in California Civil Code § 52(b)(3).

256.   Defendants, and each of them, for the respective acts and violations pleaded herein above, are liable to Plaintiff for damages, penalties and attorneys' fees as provided in California Civil Code § 52.1(b).

## **PRAYER**

**WHEREFORE**, Plaintiffs pray for the following relief from Defendants, and each of them, for each of the above causes of action:

(i)     For compensatory damages, including general and special damages, as well as incidental damages, according to proof;

(ii)    For punitive damages pursuant to 42 U.S.C. §§1983, 1988 and any other applicable laws or statutes, in an amount sufficient to deter and make an example of each non-governmental entity Defendant;

(iii)   For statutory damages and/or civil penalties, according to proof,

(iv)    For prejudgment interest according to proof;

(v)     For reasonable attorneys' fees pursuant to 42 U.S.C. §§ 1983 & 1988;

(vi)    For reasonable attorneys' fees pursuant to California Civil Code §§ 52.1, 52(b)(3), CCP §1021.5 and any other applicable state law provisions;

(vii)   For costs of suit; and

(viii)  For such further relief which is just and proper.

///

///

Dated: September 15, 2019                 Respectfully Submitted,

                                          ORANGE LAW OFFICES, P.C.
                                          LAW OFFICE OF RACHEL STEINBACK
                                          HADSELL STORMER & RENICK LLP

                                          By:   _/s/ Rachel Steinback_____
                                                Rachel Steinback
                                                Attorneys for Plaintiffs


## **JURY DEMAND**

Plaintiffs hereby demand a trial by jury in this action.


Dated: September 15, 2019                 Respectfully Submitted,

                                          ORANGE LAW OFFICES, P.C.
                                          LAW OFFICE OF RACHEL STEINBACK
                                          HADSELL STORMER & RENICK LLP

                                          By:   _/s/ Rachel Steinback_____
                                                Rachel Steinback
                                                Attorneys for Plaintiffs

[PROPOSED] THIRD AMENDED
COMPLAINT