Dan Stormer, Esq. [S.B. # 101967]
Brian Olney, Esq. [S.B. #298089]
HADSELL STORMER RENICK & DAI LLP
128 N. Fair Oaks Avenue
Pasadena, California 91103
Telephone: (626) 585-9600
Facsimile: (626) 577-7079
Emails: dstormer@hadsellstormer.com
        bolney@hadsellstormer.com

Attorneys for Plaintiffs

[Additional Counsel continued on next page]

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

KARLA GARCIA ARANDA, an individual; ALFREDO ARANDA, an individual; and Minor Plaintiff B.A., by and through his Guardian *ad Litem*, Karla Garcia Aranda,

Plaintiffs,

v.

COUNTY OF LOS ANGELES, a public entity, LOS ANGELES DEPARTMENT OF CHILDREN AND FAMILY SERVICES, a subdivision of the County of Los Angeles; RUBEN JIMENEZ, an individual; MELISSA RAMIREZ, an individual; LYDIA BUENO, an individual; ALEXANDRA RONCES, an individual; GLADYS ESCOBEDO, an individual; EVITA SALAS, an individual, ANTONIA LOPEZ, an individual; RACHEL SIMONS, an individual; GLORIA MEJIA, an individual; STEPHANIE MORALES, an individual; LAURA LUNA, an individual; SANDRA JIMENEZ, an individual; OFFICER PACHECO, an individual; OFFICER ESPINOZA, an individual, and DOES 1-10,

Defendants.

Case No.: 19-cv-01770-RGK (RAO)
[Assigned to the Honorable R. Gary Klausner– Courtroom 850]

**SECOND AMENDED COMPLAINT FOR DAMAGES**

1. Violation of Civil Rights 42 U.S.C. § 1983 (Fourth Amendment)
2. Violation of Civil Rights 42 U.S.C. § 1983 (Municipal Liability - *Monell*)
3. Violation of Civil Rights 42 U.S.C. § 1983 (Fourteenth Amendment)

(*Supplemental Jurisdiction*)

4. Negligence (Cal. Civ. Code §§ 1714 and 3333)
5. Negligence *Per Se*
6. Violation of Mandatory Duty
7. Bane Act (Cal. Civ. Code. § 52.1)

**DEMAND FOR JURY TRIAL**

Complaint filed:      August 15, 2018
Trial Date:           March 31, 2020

1    [Additional Counsel continued from previous page]

2
3    Olu K. Orange, Esq. (SBN 213653)
     o.orange@orangelawoffices.com
     ORANGE LAW OFFICES, P.C.
4    3435 Wilshire Boulevard, Suite 2910
     Los Angeles, California 90010
5    TEL: (213) 736-9900
     FAX: (213) 417-8800

6

7    Rachel Steinback, Esq. (SBN 310700)
     LAW OFFICE OF RACHEL STEINBACK
8    P.O. Box 291253
     Los Angeles, CA 90029
9    Telephone: (213) 537-5370
     Facsimile: (213) 232-4003
10   Email: steinbacklaw@gmail.com

11   Attorneys for Plaintiffs

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

SECOND AMENDED COMPLAINT

COME NOW PLAINTIFFS, Minor Plaintiff B.A., by and through his Guardian *ad Litem*, Karla Garcia Aranda; and KARLA GARCIA ARANDA ("Karla"), and ALFREDO ARANDA ("Alfredo") (B.A., Karla, Alfredo collectively, "Plaintiffs") and hereby allege as follows:

## JURISDICTION AND VENUE

1.      Plaintiffs bring this case pursuant to 42 U.S.C. §§ 1983, 1988. Jurisdiction is based upon 28 U.S.C. §§ 1331, 1343 (1–4). Supplemental jurisdiction exists over the state claims and Defendants pursuant to 28 U.S.C. § 1367. Plaintiffs have satisfied the Tort Claims Act as to California state law claims made herein.

2.      The claims alleged herein arose from events or omissions that occurred in the County of Los Angeles. Therefore, venue lies in the Central District of California pursuant to 28 U.S.C. § 1391(b)(2).

## PARTIES

3.      At all times relevant herein, Plaintiffs were residents of Los Angeles County, California. Plaintiff Karla Garcia Aranda is the mother of minor Plaintiff B.A. Plaintiff Alfredo Aranda is B.A.'s father. At the time of the incidents giving rise to the causes of action began, B.A. was the age of eleven years old.

4.      Plaintiffs are informed, believe, and thereupon allege that Defendant COUNTY OF LOS ANGELES ("Defendant County") is a duly constituted governmental entity in the State of California, and is, or was, the employer of all individually named Defendants including, but not limited to, those who are sued in their individual and official capacities, as well as one, or all, of Defendant DOES 1 through 10.

5.      The identities, capacities, and/or or nature of involvement of Defendant DOES 1 through 10 ("Doe Defendants") are presently unknown to Plaintiffs. Plaintiffs therefore sue such persons using "Does" as fictitiously-named defendants. Plaintiffs are informed, believe, and thereupon allege that there is likely to be evidentiary support to prove that each Doe Defendant was involved in some manner and legally responsible for

the acts, omissions, and/or breaches of duty alleged below. Plaintiffs will amend the Complaint to name the Doe Defendants upon learning their true identities and roles in the actions complained of herein.

6.     All of the facts, acts, omissions, events, and circumstances herein mentioned and described occurred in the County of Los Angeles, State of California, and the corporate and/or entity Defendants, and each of them, are residents of the County of Los Angeles, State of California, and/or have their principal place of business in said County and State, and/or are doing business in said County and State.

7.     Plaintiffs are informed, believe, and thereupon allege that all Does were employed by Defendant County and were, at all times relevant and material to this Complaint, acting within the course and scope of their employment duties for Defendant County, and under color of law. Plaintiffs are informed, believe, and thereupon allege that each of the individual Defendants' acts were known to, discovered by, approved by, and/or ratified by Defendant County, by and through their policy makers, decision makers, officials, officers, and/or supervisors and applicable Doe Defendants.

8.     Plaintiffs are informed, believe, and thereupon allege that all Defendants employed by Doe Defendants, at all times relevant and material to this Complaint, were acting within the course and scope of their employment duties for Doe Defendants, under color of law. Plaintiffs are informed, believe, and thereupon allege that each of the individual Defendants' acts were known to, discovered by, approved by, and/or ratified by Doe Defendants, by and through policy makers, decision makers, and/or supervisors, including applicable Doe Defendants.

9.     Plaintiffs are informed, believe, and thereupon allege that officials, supervisors, policy makers, and other individuals with the authority to set or modify municipal and/or departmental policy, *de jure* or *de facto*, of Defendant County and/or Doe Defendants, participated in, approved of, ratified, and/or failed to prevent the acts by individually named defendants and Doe Defendants of which Plaintiffs complain herein.

SECOND AMENDED COMPLAINT             -2-

10.     Plaintiffs are informed, believe, and thereupon allege that at all times herein mentioned, each of the Defendants—including officials, supervisors, watch commanders, and other policy makers from Defendant County and/or Doe Defendants and their agents—was the agent, employee, or co-conspirator of one other, some, or all of their Co-Defendants. Plaintiffs are informed, believe, and thereupon allege that individually named defendants and each of the Doe Defendants, acting individually and/or in concert with each other, engaged in a common plan to wrongfully deprive Plaintiffs, and each of them, of their respective rights to privacy, familial association, security in person and effects, freedom from unreasonable seizures, and due process of law, among others described herein. In doing each and all of the things herein mentioned, or neglecting or intentionally failing to rectify said misconduct, each and all Defendants were acting pursuant to a *de facto* policy and within the scope of such agency, employment, and conspiracy and with full permission, knowledge, approval, ratification, and support of each other.

11.     At all times relevant herein, Defendant COUNTY OF LOS ANGELES, DEPARTMENT OF CHILDREN AND FAMILY SERVICES ("DCFS") was and is a subdivision or entity of the COUNTY OF LOS ANGELES.

12.     At all times relevant herein, Defendant social worker, RUBEN JIMENEZ, ("CSW JIMENEZ") was an individual residing, on information and belief, in the County of Los Angeles, and an officer, agent and employee of COUNTY and DCFS, acting under color of law and within the course and scope of his employment, and driven by COUNTY'S official policies and practices.

13.     At all times relevant herein, Defendant social worker ILANA LARA ("CSW LARA") was an individual residing, on information and belief, in the County of Los  Angeles, and an officer, agent and employee of COUNTY and DCFS, acting under color of law and within the course and scope of her employment, and driven by COUNTY'S official policies and practices.

14.     At all times relevant herein, Defendant social worker MELISSA RAMIREZ

("CSW RAMIREZ") was an individual residing, on information and belief, in the County of Los Angeles, and an officer, agent and employee of COUNTY and DCFS, acting under color of law and within the course and scope of her employment, and driven by COUNTY'S official policies and practices.

15.   At all times relevant herein, Defendant social worker LYDIA BUENO ("CSW BUENO") was an individual residing, on information and belief, in the County of Los Angeles, and an officer, agent and employee of COUNTY and DCFS, acting under color of law and within the course and scope of her employment, and driven by COUNTY'S official policies and practices.

16.   At all times relevant herein, Defendant social worker ALEXANDRA RONCES ("CSW RONCES") was an individual residing, on information and belief, in the County of Los Angeles, and an officer, agent and employee of COUNTY and DCFS, acting under color of law and within the course and scope of her employment, and driven by COUNTY'S official policies and practices.

17.   At all times relevant herein, Defendant social worker GLADYS ESCOBEDO ("CSW ESCOBEDO") was an individual residing, on information and belief, in the County of Los Angeles, and an officer, agent and employee of COUNTY and DCFS, acting under color of law and within the course and scope of her employment, and driven by COUNTY'S official policies and practices.

18.   At all times relevant herein, Defendant social worker EVITA SALAS ("CSW SALAS") was an individual residing, on information and belief, in the County of Los Angeles, and an officer, agent and employee of COUNTY and DCFS, acting under color of law and within the course and scope of her employment, and driven by COUNTY'S official policies and practices.

19.   At all times relevant herein, Defendant social worker ANTONIA LOPEZ ("CSW LOPEZ") was an individual residing, on information and belief, in the County of Los Angeles, and an officer, agent and employee of COUNTY and DCFS, acting under color of law and within the course and scope of her employment, and driven by

1    COUNTY'S official policies and practices.

2        20.    At all times relevant herein, Defendant social worker RACHEL SIMONS

3    ("CSW SIMONS") was an individual residing, on information and belief, in the County

4    of Los Angeles, and an officer, agent and employee of COUNTY and DCFS, acting

5    under color of law and within the course and scope of her employment, and driven by

6    COUNTY'S official policies and practices.

7        21.    At all times relevant herein, Defendant social worker GLORIA MEJIA

8    ("CSW MEJIA") was an individual residing, on information and belief, in the County of

9    Los Angeles, and an officer, agent and employee of COUNTY and DCFS, acting under

10   color of law and within the course and scope of her employment, and driven by

11   COUNTY'S official policies and practices.

12       22.    At all times relevant herein, Defendant social worker STEPHANIE

13   MORALES ("CSW MORALES") was an individual residing, on information and belief,

14   in the County of Los Angeles, and an officer, agent and employee of COUNTY and

15   DCFS, acting under color of law and within the course and scope of her employment,

16   and driven by COUNTY'S official policies and practices.

17       23.    At all times relevant herein, Defendant social worker LAURA LUNA

18   ("CSW LUNA") was an individual residing, on information and belief, in the County of

19   Los Angeles, and an officer, agent and SUPERVISING employee of COUNTY and

20   DCFS, acting under color of law and within the course and scope of her employment,

21   and driven by COUNTY'S official policies and practices.

22       24.    At all times relevant herein, Defendant social worker SANDRA JIMENEZ

23   ("CSW S. JIMENEZ") was an individual residing, on information and belief, in the

24   County of Los Angeles, and an officer, agent and employee of COUNTY and DCFS,

25   acting under color of law and within the course and scope of her employment, and

26   driven by COUNTY'S official policies and practices.

27       25.    At all times relevant herein, Defendant Sheriff PACHECO ("OFFICER

28   PACHECO") was an individual residing, on information and belief, in the County of Los

SECOND AMENDED COMPLAINT          -5-

Angeles, and an officer, agent and employee of COUNTY, the Sheriffs' Department, acting under color of law and within the course and scope of his employment.

26.   At all times relevant herein, Defendant Sheriff ESPINOZA ("OFFICER ESPINOZA") was an individual residing, on information and belief, in the County of Los Angeles, and an officer, agent and employee of COUNTY, the Sheriffs' Department, acting under color of law and within the course and scope of his employment.

27.   As a result of the acts and omissions alleged herein, Minor Plaintiff B.A. suffered physical abuse, neglect, PTSD, anxiety, fear, hopelessness, depression, forced separation, inability to focus and concentrate, trouble sleeping, severe and profound emotional and mental distress.

28.   As a result of the acts and omissions alleged herein, Plaintiff Karla Garcia Aranda suffered forced separation, PTSD, anxiety, fear, hopelessness, depression, inability to focus and concentrate, trouble sleeping, severe and profound emotional and mental distress.

29.   As a result of the acts and omissions alleged herein, Plaintiff Alfredo Aranda suffered forced separation, PTSD, anxiety, fear, hopelessness, depression, inability to focus and concentrate, trouble sleeping, severe and profound emotional and mental distress.

30.   Minor Plaintiff B.A. presented his Tort Claim on 1-16-18 and Amended Tort Claim on 1-31-18 within one year of release to Plaintiff Karla Garcia's custody on 10-9-2017. His cause of action accrued on 10-9-2017, under Government Code  Section 911.4 (c) (2) (A) based on the fact that Minor Plaintiff was in the custody and control of defendant County DCFS to which this claim was to be presented and under (c) (3) on the grounds that Minor Plaintiff was a dependent child of the juvenile court under the Arnold-Kennick Juvenile Court Order (commencing with Section 200) of Part 1 of Division 2 of the Welfare and Institutions Code, without a guardian ad litem or conservator for purposes of filing civil actions until released to his mother, Plaintiff Karla on 10-9-2017.

31.     Minor Plaintiff B.A.'s. Tort Claim was rejected on 2-15-2018. Plaintiff KARLA GARCIA ARANDA was appointed guardian ad litem for minor Plaintiff B.A.

32.     Plaintiffs' counsel filed a N 570 petition and obtained a court order in dependency court pursuant to *Welfare and Institutions Code* section 827 to inspect and copy Plaintiffs' confidential juvenile court records and DCFS records for use in this litigation.

33.     This action for damages arises from Minor Plaintiff B.A.'s more than two year forced separation from his parents, Plaintiff Karla Garcia Aranda and Plaintiff Alfredo Aranda, based on falsified domestic violence reports by two Sheriff s officers in retaliation for Alfredo's complaint against said officers, based on falsified allegations, based on falsified SDM Assessments, based on falsified DCFS request for protective order, falsified dependency petitions, falsified court reports, falsified placement agreements, and forgery, committed by at least two dozen DCFS social workers, supervisors, and administrators.

## **INTRODUCTION**

34.     In the Defendant County of Los Angeles ("County") and Defendant Department of Children and Family Services ("DCFS"), the widespread use of perjury by social workers to secure custody of hundreds of thousands of children without cause reached critical mass in 2017. Approximately two thousand (2000) children were removed from four thousand (4000) parents each month - a total of seventy-two thousand (72,000) children and parents. Based on Defendant County's records, eighty three percent (83% i.e. 1600, out of the 2000), were never abused or neglected; 10 % were physically abused, and 7% were sexually abused.

35.     The children are warehoused in undisclosed locations without a trial or evidence with limited monitored contact with parents. The visits are 2 to 4 hours per week at a McDonalds or a room in the local DCFS office. Forced separation of children from their parents is child abuse leading to permanent and irreparable damage.

36.     In 2016, approximately 1500 perjured dependency petitions were filed each

month by Defendant County against 1600 well cared for children (never abused/neglected) taken from 3200 parents for a total 38,400 parents and 19,200 children. Court appointed attorneys instructed indigent parents to abandon their due process rights to trial on the pretext that the judge does not like them or their case. The court rubber stamped the perjury based on the no contest pleas and ordered 19,200 children into foster care without trials or evidence. Each foster child brings Defendant County up to $150,000.00 per year in federal foster care funds under Title IV E of the Social Security Act and state foster care funds for a total estimated $2 Billion in 2017 for unnecessary foster care for an estimated 19,200 children seized from 38,400 parents.

37.    Historically, social worker perjury has been a defining issue in Defendant County for over twenty (20) years. In 1995, the Legislature held statewide hearings leading to enactment of Government Code Section 820.21 (Gov't Code) to curb the use of social worker perjury and false evidence by removing immunity to allow parents and children to hold social workers accountable. The 1995 Legislative Digest documented numerous complaints of widespread perjury in dependency court proceedings; the majority of the parents indigent and, on advice of counsel, pled no contest leaving the perjury unchecked and rubber-stamped by "unwitting" hearing officers who ordered well cared for children into foster care without evidence or trial.

38.    Since 1995, the unchecked use of perjury by Defendant County and Defendant DCFS' social workers surged notwithstanding enactment of Gov't Code Section 820.21. In 2012, approximately nine hundred (900) children were removed each month from 'one thousand eight hundred (1800) parents for an estimated $1.8 Billion in Title IV E federal foster care funds and state foster care funds. As alleged above, by 2017, the number of children removed each month surged to two thousand (2000) bringing the Defendant County $2.2 billion in Title IV E federal foster care funds.

39.    Since enactment of section 820.21 in 1995, the unfettered use of malicious perjury and falsified documents to secure custody of hundreds of thousands of children for placement in foster care driven by financial incentives continues unabated in counties

statewide, including Defendant County. (See California Department of Social Services, Stakeholders Report, 2002). Plaintiffs herein identified hundreds of parents who also lost their children due to perjury, falsified evidence, and deception, who agreed to come forward to testify that the same thing happened to them that happened to Plaintiffs; that Defendant DCFS removed their children based on perjury, fraud, deception, and coercion without evidence or trial. The testimony of these families is consistent with the Legislative findings documented in the Legislative digest in 1995 that attorneys strongly advised parents to plead no contest to perjury and false allegations.

40.     California's Little Hoover Commission also found that the overwhelming majority of the children should not have been removed from parental custody into foster care where the risk of abuse and neglect is ten times greater than in the general population, including Defendant County, the suicide rate is double, as well as drug addiction, school drop outs, and minor motherhood. (See The Little Hoover Report, 2005 and Report, 2002).

41.     Accordingly to the Los Angeles County Grand Jury in 2009, a shocking 70% of California prison inmates come from the foster care system, referred to herein as "*The faster care prison industrial complex*". But there's more, by 2017, sex slavery, trafficking, and prostitution of 12-14 year old foster children under court ordered supervision accounted for 70% of the sex trade statewide, including Defendant County.

42.     Thousands of separated children are routinely placed in harm's way in Defendant County's foster care system to suffer abuse, neglect, rape suicide, drug addiction, academic failure, minor motherhood, sex slavery, trafficking, and prostitution in the *"The Foster Care Prison Industrial Complex."*

43.     The Legislative intent to protect children and preserve families is set forth in *Welfare and Institutions Code* (WIC) section 202 and section 16000 (a). Section 202 provides in pertinent part as follows: "The purpose of this Chapter is to provide for the protection and safety of the public and each minor under the jurisdiction of the juvenile court and to preserve and strengthen the minor's family ties whenever possible,

removing the minor from the custody of his or her parents only when necessary for his or her welfare or for the safety and protection of the public.

44.     *WIC* section 16000 (a) provides in pertinent part as follows: "It is the intent of the Legislature to preserve and strengthen a child's family ties whenever possible, removing the child from the custody of his or her parents only when necessary for his or her welfare or for the safety and protection of the public."

45.     The Legislature promulgated SDM Policy and Procedures Manual, SDM 3.07 October 2015 (Structured Decision Making System) which imposes mandatory statutory duties on social workers to assess domestic violence and substance abuse, as in this case, in accordance with the definitions set forth in the SDM Hotline Tools Definitions, the SDM Safety Assessment Definitions, and the SDM Safety Assessment Definitions.

46.     SDM Safety Assessment Definitions SDM Safety Assessment (p. 30) imposed mandatory duties on social workers to "mark all criteria that apply" and "do not mark items if the caller's information does not reach the threshold of the definition for an item". "Appropriate Completion. Workers should familiarize themselves with the items that are included on the safety assessment and the accompanying definitions. (p. 50) What distinguishes SDM is that is ensures that every worker is assessing the same items in each case, and that the responses to these items lead to specific decisions. SDM ensures that the specific items that comprise the safety assessment are assessed at the sometime during the initial contact ... Record the date of the safety assessment. The date of assessment is typically the date that the worker made the initial face-to-face contact with the child to assess safety.

47.     SDM Hotline Tools Definitions (p. 11) imposed mandatory statutory definitions of domestic violence as follows: "incidents that occur while the child is present" and on page 12 as "[t]he child has witnessed, intervened in, or is otherwise aware of physical altercations, serious verbal threats, or intimidation between adults in the home".

SECOND AMENDED COMPLAINT          -10-

48.     SDM Safety Assessment Definitions (page 38) imposed the mandatory statutory threshold definition of domestic violence as follows: "[d]omestic violence likely to injure child. There have been incidents of household violence that created danger of serious physical injury to a child AND there is reason to believe that this may occur again (e.g. alleged domestic violence perpetrator and victim are still involved in relations; a pattern of household violence continues to exist) and or a recent history of one or more physical assaults between intimate members of the household known by credible reports."

49.     The SDM Hotline Tools Definitions imposed mandatory duties on social workers to "Evaluate out: No Criteria are marked. Mark this decision if no criteria in Section A are6 marked, which means that the report does not meet the statutory requirements for an in-person response". (p. 19) The SDM Hotline Tools Definitions imposed mandatory duties on social workers to "mark all criteria that apply. Do not mark items if the caller's information does not reach the threshold of the definition for an item." (p. 30)

50.     SDM Safety Assessment Definitions in Section 1: Safety Threats (p.52) imposed mandatory duties on social workers to assess critical threats in every case: "This is a list of 10 critical threats (nine identified and defined and an "other") that must be assessed by every worker in every case. These threats cover the kinds of conditions that, if they exist, would render a child in danger of immediate, serious harm."

51.     The Legislature promulgated California Department of Social Services (CDSS) Manual of Policies and Procedures (MPP) Division 31-135 to implement express Legislative intent in *WIC* section 16000 (a) and section 202 to protect children and preserve and strength family ties. The MPP provides in pertinent part, as follows: GENERAL 31-001 ".1 The requirements specified in Sections 31-005 through 31-525 shall be met by the county in the administration of child welfare services."

52.     MPP Division 31-135 imposed mandatory statutory duties on Defendant County, Defendant DCFS, and Defendant social workers, to "ensure" that authority to

remove the child exists prior to removal as follows: "when a social worker determines that the child cannot be safely maintained in his/her own home, the social worker must ensure that authority to remove a child exists prior to removal."

53.     MPP Division 31-320.2 imposed mandatory statutory duties on Defendant County, Defendant DCFS, and Defendant social workers, to visit the child three times during the first 30 days in foster care.

54.     MPP Division 31-320.3 imposed mandatory statutory duties on Defendant County, Defendant DCFS, and Defendant social workers, to thereafter visit the child monthly.

55.     MPP Division 31-330 imposed mandatory statutory duties on Defendant County, Defendant DCFS, and Defendant social workers, to have monthly contacts with the care provider.

56.     MPP Division 31-401.5 imposed mandatory statutory duties on Defendant County, Defendant DCFS, and Defendant social workers, to place children in an appropriate licensed or approved facility.

57.     MPP Division 31-410. 52 imposed mandatory statutory duties on Defendant County, Defendant DCFS, and Defendant social workers, to temporarily place children in an appropriate licensed or approved facility.

58.     Under Health and Safety Code section 1508, a valid license for foster care is required.

59.     To "ensure that authority to remove a child [based on domestic violence and substance abuse] exists *prior* to removal" in accordance with mandatory statutory duties imposed by MPP Division 31-135, Defendant County, Defendant DCFS Policy 0070-502.10 "Child Protection Hotline" imposed mandatory duties on the Child Abuse Hotline worker to "identify the types of calls which constitute appropriate child abuse referrals pursuant to law and Structured Decision Making (SDM) Tools and to elicit the purpose of the call from the caller by allowing the caller to explain why they contacted the Department and asking pertinent followup questions. Continue gathering relevant

information from the caller until you are able to assess whether or not a referral is warranted. 5. If you determine that a referral is warranted: b. Elicit all pertinent information known to the caller that would enable you to accurately answer the questions contained in the SDM Hotline Tool decision trees and arrive at an appropriate response determination."

60.     Defendant DCFS Policy 0070-502.10 "Child Protection Hotline" 'Classifying Allegations' imposed mandatory duties on workers to "complete one SDM Hotline tool for each allegation."

61.     'Defendant DCFS Policy 0070-502.10 "Child Protection Hotline" 'Classifying Allegations' imposed mandatory duties on the worker to complete the SDM Hotline tool to the referral and forward to the Supervising Children's Social Worker (SCSW) and mandatory duties on the supervising worker to "review the referral and the SDM Hotline tool used by the CSW for thoroughness and accuracy. If not, take action to correct the referral.

62.     Defendant DCFS Policy 0070-537.10 "Assessment of Domestic Violence" requires that a child be exposed to and or is the victim of domestic violence, and that the worker complete the Structured Decision Making Safety Assessment and Family Risk Assessment Forms.

63.     In accordance with MPP Division 31-135's mandatory duties to "ensure that authority to remove a child for physical abuse exists prior to removal", Defendant DCFS Policy 0070-548 "Taking Children into Temporary Custody" provides as follows: "Complete the SDM Safety Assessment within two business days of initial contact for all referrals ... 2. If one or more safety threats are present, and placement is the only protecting intervention possible, determine legal ground for detention. This requires at least one of the following: a. Parental consent; b. Exigent circumstances; c. Court order for detention d. If you don't get parental consent or exigent circumstances, contact your SCSW and start gathering information for a warrant." 3/8 Policy 0070-548.

64.     Defendant DCFS Policy 0300-303.15 "Writing the Detention Report"

imposes additional mandatory duties on social workers as follows: "Prior to creating the Detention Report complete the following: ... Complete the SDM Safety and Risk Assessment tools", Defendant County and Defendant DCFS' Policy 0300-303.15 also imposes mandatory duties on emergency response supervising social workers and assistant regional administrators to implement Division 31-135 as follows: "Review the packet, Detention Report, and any supporting documents, including all SDM tools used".

65.     In accordance with mandatory statutory duties imposed by MPP Division 31-135 to "ensure that authority to remove a child exists prior to removal", Defendant DCFS Policy 0300-303.15 "Writing the Detention Report" also requires the CSW to obtain information regarding the children's medical, mental, emotional and school history and potential needs ... and prior to creating the Detention Report, the CSW is required to review the on-line case records to ensure the information is recorded and correct. The ER SCSW is required to review the packet, Detention Report, any an~ all supporting documents, including all SDM tools used. If approved, sign and date the report and return the packet to the SCSW for on-line approval. The ER ARA is also required to review the packet, Detention Report, any and all supporting documents, including all SDM tools used.

66.     In accordance with mandatory statutory duties imposed by MPP Division 31-135 to "ensure that authority to remove a child exists prior to removal", Defendant DCFS Policy 0300-503.10 "Writing the Jurisdiction Report", requires that the report be based on an independent investigation by the social worker and that the DI CSW review the online case record and update the case record if necessary. Section 5. Requires the CSW to document all contacts in the Contact Notebook (Delivered Services Log). The DI SCSW is required to review the Contact Notebook on line and the Jurisdiction/Disposition packet and approve the report. The ARA is also required to review the Jurisdiction/Disposition packet, including all SDM tools used, and approve the report.

67.     Typically, Defendant DCFS social workers fabricate "authority" to remove

children maliciously by marking items as a risk on SDM Assessment tools that do not meet the SDM or DCFS definitions and by fabricating child abuse allegations in some 1500 deceptive WIC section 300 petitions; and by covering up known material exculpatory evidence committed with malice for which there is no immunity under *Gov't Code* section 820.21.

68.     The Defendant DCFS' systemic use of perjury, deception, lies, cover-up, and despicable criminal conduct since at least 1987, forced separation of thousands of children constituting government sanctioned child abuse with life altering damages including Minor Plaintiff B.A. Defendant DCFS social workers deprived families of human, legal, and constitutional rights resulting in profound damages, civil judgments, and settlements in the tens of millions of dollars and counting.

69.     In practice, as in this case, Defendant social workers falsified the SDM Safety Assessments by marking risk and safety items they knew did not meet the DSM definition to secure removal of B.A. in clear violations of mandatory duties imposed by CDSS MPP Division 31-001 and 31-135 constituting felonies under Penal Code Section 115.

70.     In addition to falsified SDM Safety and Risk Assessments in violation of CDSS MPP Division 31-135, Defendant social workers also filed numerous perjured documents in dependency court, falsified evidence, concealed exculpatory evidence, and committed forgery to conceal B.A.'s placement with an unlicensed individual for three months whose day care license was revoked by the state six months prior to B.A.s' placement. This individual was repeatedly investigated by law enforcement for domestic violence prior to and during B.A.'s illegal placement. On numerous occasions when law enforcement came to the Urbina house, B.A. was locked in the closet for hours with no air or light.

71.     Unlicensed Urbina had no provider number, therefore, she was not paid by DCFS for B.A. Plaintiff Karla was threatened by this individual that if Karla did not pay her $200, she would steal B.A's identity. Karla paid the demand and Urbina still

purchased items using his social security number.

72.     Thereafter, Defendant social workers removed B.A. from Urbina and placed him in more than a dozen foster homes until he was released to Karla's custody on October 9, 2017.

73.     On 8-8-2017, Plaintiff Alfredo Aranda was sent to the Adelanto detention center for immediate deportation. At Adelanto, Alfredo was denied adequate medical care resulting in severe liver damage, suffering cruel, and unusual punishment. Alfredo was released on 2-4-2018 with severe damages due to lack of medical care causing permanent injuries.

74.     Plaintiffs seek redress for Defendants' cruel and inhumane forced separation, child abuse, attempted deportation, perjury, falsified evidence, from cover-up, and malicious violation of mandatory statutory duties imposed by MPP 31-135 and 31-320/2. 31-320.3, 310- 330, 31-401.5, 31-410.52, Health and Safety Code section 1508 (valid license required for foster care) and by California Structured Decision Making Definitions; intentional infliction of emotional distress, willful and wanton misconduct as well as violations of federal law pursuant to 42 U.S.C. § 1983 including violations of Due Process, Fourth and Fourteenth Amendments of the United States Constitution, the Civil Rights Act of 1991 and 1964, as amended, 42 U.S.C. § 2000e-3; 42 U.S.C § 2000e-16 et. seq., and *Monell* violations. Each Plaintiff alleges damages in excess of $5,000,000.00.

## COMMON ALLEGATIONS

75.     In 2013, Minor Plaintiff B.A. (age 11) was well cared for, happy, and healthy in his child centered home with his mother and father, Karla Garcia Aranda, and Alfredo Aranda. Karla and Alfredo were employed with no criminal records. B.A.' s grades, attendance and class participation were rated as good by his teacher, Javier Landarzuri. Karla and Alfredo were active in meeting with B.A.' s teachers at parent teachers' meetings.

76.     In October 2013, Alfredo submitted Complaint # 234483 against Los

Angeles Sheriffs Dept. officers, Defendants Pacheco and Espinoza, for inappropriate conduct.

77.    In retaliation for Alfredo's complaint to LASD, Defendant Pacheco and Defendant Espinoza reported a false domestic violence call to the DCFS Hotline on Alfredo and Karla on December 28, 2013 to secure removal of B.A. from Alfredo and Karla's custody. The Hotline refused to open a case based an isolated incident.

78.    To establish the "history" DCFS required to remove B.A., Defendant Pacheco and Defendant Espinoza falsified a second domestic violence report on 5-5-2014 to the DCFS Hotline on Alfredo Aranda and Karla Garcia purportedly received by LASD on 12-29-2011.

79.    On 12-31-2013, Alfredo moved to his parent's home to ensure B.A. was not seized by Defendant DCFS.

80.    On 1-9-2014, Karla met with CSW Georgina Barahona and agreed to enroll in domestic violence classes and counseling. CSW Barahona questioned B.A. about the domestic violence. B.A. stated that he never saw any domestic violence and was safe at home.

81.    On 4-15-14, Karla signed a Voluntary Family Maintenance case plan with DCFS to ensure B.A. was not removed from her custody.

82.    On 4-24-2014, the CSW requested the call log from LASD for the purported DV call on 12-28-13. The CSW learned there was no such call as follows: "On 4/24/2014, DCFS requested the call logs to the family and home address from East Los Angeles Sheriff s Department records and was informed there were no calls recorded for 2013 as reported by the reporting party." In addition, there was no call to LASD on December 28, 2013 according to official LASD's Call Logs obtained by Karla from LASD as recent as July and August 2017.

83.    On 5-5-2014, Defendant Pacheco and Defendant Espinoza falsified a second domestic violence call to the DCFS Hotline purportedly received by LASD on 12-29-11, three years prior. This was another ruse/pretext for DCFS to seize B.A. from

Karla's custody for placement in foster care based on a "history" of domestic violence fabricated by Defendant Pacheco and Defendant Espinoza. As alleged above, as recent as July and August 2017, there was no call to LASD on 12-29-11, according to official LASD's Call Logs obtained by Karla from LASD.

84.    On 5-5-2014, a Defendant DCFS CSW removed B.A. from Karla's custody based on the two domestic violence referrals fabricated by Defendant Pacheco and Defendant Espinoza even though there was no call log on either 12-28-13 or 12-29-11; even though B.A. stated to CSW Barahona on 1-9-14, that he heard and observed no domestic violence, even though Alfredo was no longer in the home since 12-31-14; even though Karla was in a Voluntary Case Plan under DCFS supervision; and even though there was no domestic violence as defined in the Penal Code and California Structured Decision Manual Definitions.

85.    The 8DM Definition for domestic violence requires current, ongoing DV to prove/show a risk of harm to the child to justify removal. In this case, the last purported domestic violence incident occurred four months prior to removal, if at all. Under the statutory SDM Definitions, an incident four months prior is not "current and ongoing", hence, these facts failed to meet the statutory definition to authorize removal under MPP 31-135. In addition, B.A. was already protected under the Voluntary Case Plan with DCFS, his parents were separated with no contact as instructed by DCFS. The restraining order secured by Defendants Pacheco and Defendant Espinoza against Alfredo was in full force and effect.

86.    On 5-8-14, a CSW filed a perjured WIC 300 petition and detention report based on the two purported D V referrals falsified by Pacheco and Espinoza. At the hearing in dependency court, Defendants Pacheco and Defendant Espinoza testified that the red blotches of skin on Karla's chest and neck in the LASD photo were injuries inflicted by her husband, Alfredo, knowing the red blotches were caused by Karla's Lupus, an inflammatory skin condition that breaks out under periods of stress and pressure. In fact, Karla broke out with the same red blotches in court as shown in the

SECOND AMENDED COMPLAINT          -18-

photograph purporting to depict physical abuse by Alfredo.

87.  The dependency court sustained the petition at the jurisdiction hearing based on the perjured testimony of Defendant Pacheco and Defendant Espinoza and immediately released B.A. to Karla's custody based on the following conditions: (1) divorce Alfredo Aranda; (2) comply with the LASD restraining order forbidding Alfredo to be around her or B.A; (3) complete court ordered programs; and (4) maintain monitored visits between B.A. and Alfredo, several hours per week.

88.  From 5-8-14 continuing to 6-2-15, CSW Arroyo and SCSW Gandarilla closely supervised and monitored B.A., Karla, and Alfredo. CSW Arroyo and SCSW Gandarilla confirmed and verified Karla's and B.A.'s compliance with all court orders based in part, on face to face contact in the home on no less than a dozen occasions.

89.  On 6-2-15, CSW Arroyo and SCSW Gandarilla filed a Status Review Report in dependency court that recommended jurisdiction be terminated with full custody of B.A. to Karla based on Karla's full compliance with all court orders.

90.  CSW Arroyo and SCSW Gandarilla recommended that the court terminate jurisdiction with a family law order giving mother Karla Garcia full physical and legal custody of minor B.A.

91.  CSW Arroyo reported that "Mother has been responsible for the minor's basic needs and following the court order of not having any contact with father. Mother has demonstrated to be willing to comply with court orders … **Brian is well cared for and actively participating in school.**" (emphasis added).

92.  CSW Arroyo reported that, "B.A. had continued to have weekly visits with his father. B.A. is picked up by godfather Walter Rodriguez who monitors visits in the area of Southgate, usually on Saturday at the park". (*Status Review Report p. 9*)

93.  CSW Arroyo reported that, "[A]n in-house assessment by CSW Arroyo to evaluate the risk level for future abuse or neglect determined to be LOW ... a reassessment conducted by this SCSW to re-evaluate risk for future abuse or neglect if the minor remains in the care of Mrs. Garcia was determined to be LOW ... Therefore,

the Department is recommending that the minor remain in care of his mother Karla Garcia ... It is respectfully recommended that the court terminate jurisdiction with a family law order giving mother Karla Garcia full physical and legal custody of minor B.A. Aranda." (*Status Review Report p. 9*)

94.     The next day, on 6-3-15, Huntington Park police officers conducted a drug raid on Karla's house in Karla's absence, as well as Alfredo's parents' house, and Alfredo's brother's house. The address on the warrant was Karla's old address where she had not resided for six months, not the address that they raided. These officers made a false incident report to DCFS that stated Alfredo was living in the home with Karla and B.A selling drugs in B.A.'s presence, that drugs in a "clear lock bag" were found in the wall cabinet in Karla's bathroom (6/23/15 detention report p. 5). However, the bathroom with the baby clothes in the photo where the drugs were found, was not Karla's, but her brother in law's. The tile is different, and Karla has no babies.

95.     On 6-4-15, DCFS received the Huntington Park police report that drugs were found purportedly in Karla's bathroom noted in the Detention Report 6/23/15 by Defendant CSW Melissa Ramirez and Defendant SCSW Lydia Bueno.

96.     On 6-5-15, Emergency Response worker DCFS investigator, Defendant CSW Melissa Ramirez was assigned to investigate the LASD drug raid referral on Karla's home. Karla informed Defendant CSW Jimenez that this was not her bathroom, but her brother-in law's however, Defendant failed to investigate or take photos of Karla's bathroom. Defendant CSW. Ramirez interviewed the then current SCSW, Alejandra Gandarilla. This SCSW reported that Karla had complied with all court ordered programs, had an appropriate support system, that she saw no drugs or drug use, that Alfredo was **not** residing in the home, and had maintained monitored visits with B.A. Defendant CSW Ramirez knew from the Status Review Report filed on 6-2-15 that CSW Arroyo assessed and re-evaluated Bryan two days prior to removal as "well cared for and actively participating in school" and recommended termination of court supervision with full custody to Karla.

97.     On 6-15-15, Defendant CSW Melissa Ramirez filed a false Request for Removal Order. Defendant swore there was probable cause to believe that continuance in the home of the parents is contrary to B.A.'s welfare.

98.     On 6-18-2015, Defendant CSW Melissa Ramirez and Defendant SCSW Lydia Bueno, seized B.A. from Karla's custody based on the 6-3-2015 police report that drugs were found in Karla's bathroom and that Alfredo lived in the home. This was bald fabrication based on the recommendation several days prior to terminate jurisdiction based on Karla's full compliance with all court orders including monitored visits with Alfredo.

99.     On 6-19-15, Defendant CSW Lara had a face to face meeting with Martha Urbina documented in the contact log. Urbina was not licensed or certified for foster care. She had no DCFS provider number and would not be paid for B.A.'s care by DCFS. Defendant CSW Lara falsified information in the contact log regarding Urbina.

100.   Defendant CSW Lara falsified the contact log with regard to Urbina's identifying information. The name stated is "Martha Urbina." The correct spelling is Urbina The address stated is "725 112 Mayflower, Back Cal. 90270." There is no "Back, California". The correct address is 6251 Y2 Mayflower in Bell, Cal. 90270. According to California Community Care Licensing records, (1) Ms. Urbina's address was 6251 Y2 Mayflower in Bell, Cal. 90270; (2) Urbina was never licensed for foster care; and (3) Community Care Licensing revoked her day care license on 1-1-15.

101.   Defendant CSW Lara documented in the contact log that Urbina stated she would be willing to care for B.A.

102.   On 6-23-2015, Defendant CSW Melissa Ramirez and Defendant SCSW Lydia Bueno filed a perjured detention report that swore Karla failed to protect B.A. from Alfredo's drug abuse in the home. This is false. As alleged above, Alfredo was out of the home since December 2014 and B.A. denied any drug use by Alfredo and denied that Alfredo resided in the home and social workers verified Karla followed her Case Plan. Defendant CSW Ronces filed a *Welf & Inst Code* section 300 petition under

penalty of perjury on the same day based on the detention report. However, the petition and the detention report were inconsistent and contradictory. In the detention report, Defendant Ramirez and Defendant Bueno swore the opposite was true, to wit, that "[t]he family is not an intact family as it consists of mother Karla Garcia (26) and her son B.A. (sic) Aranda (12). Mother and father are not together. Father Alfredo Aranda (40) has monitored visits with the child B.A.". In the petition, Defendant Ronces swore Karla and Alfredo resided in the home in violation of court orders and Karla thereby created substantial risk of serious physical harm.

103.   At the jurisdictional hearing on the perjured WIC 300 petition, both Karla and Alfredo pled no contest to perjury on advice of counsel. The court sustained the perjured petition and ordered monitored visits for B.A. several hours per week.

104.   At some point after the meeting with Defendant Lara and Urbina on 6-19-15, exact date unknown, Defendant Lara placed B.A. in Urbina's custody continuing for more than three months. There is no record of B.A. 's placement with Urbina. There is no signed placement agreement. There is no fingerprint clearance. There was no facility approval. There was no provider number. On numerous occasions, Urbina threatened to steal B.A.'s identification if Karla did not pay her $200.00 stating she was not being paid by County. Karla complied.

105.   Defendant Lara knew when she placed B.A. with Urbina on or about 6-29-15, that this placement with an unlicensed individual was illegal and violated mandatory statutory duties: (1) California Community Care Licensing (CCL) never issued Urbina a foster care license; (2) CCL revoked Urbina's day care license in January 2015, six months prior to Bryan's placement on 6-29-15; (3) Defendant never signed a foster parent agreement with Urbina; (4) Defendant never cleared B.A.'s placement with Defendant DCFS' Central Placement Unit in violation of DCFS written procedures; (5) DCFS' centralized placement unit did not place B.A. with Urbina in violation of DCFS written procedures; (6) DCFS' centralized placement unit has no record of B.A.'s placement with Urbina in violation of state law and DCFS written procedures.

106.    On 7-17-15 an emergency response CS W investigated a domestic violence referral at the Urbina home involving Urbina and her adult son. This worker found that domestic violence exists in the home and poses a risk of serious physical and emotional harm to children as follows: "Parents will not leave any of the children under PGM's supervision at any time" referring to Urbina. The son and his wife informed this worker they were moving out of the Urbina home. The CSW created a 30 day case plan signed by the CSW, Urbina and her son.

107.    Despite documented, substantiated domestic violence in an unlicensed home, unsupervised and unmonitored 12-year-old B.A. was not removed from Urbina for months despite numerous domestic violence reports.

108.    On 7-17-15, Defendant CSW Escobedo replaced Defendant CSW Lara as the assigned CSW for B.A. Defendant CSW Escobedo continued the cover up of B.A.'s illegal placement with Urbina.

109.    On 7-21-15, Urbina informed Defendant Escobedo on a phone call that she was no longer able to care for B.A. This call was documented in the contact log and is the first indication that B.A. was placed with Urbina. As alleged above, the only prior mention of Urbina in the contact log was the entry a month prior on 6-19-15 documenting a face to face meeting between Defendant Lara and Urbina wherein Urbina indicated that she would be willing to care for B.A.

110.    On 7-21-15, Emergency Response worker, CSW Tanya Russell, went to the Urbina home to investigate the domestic violence referral involving Urbina and her adult son. CSW Russell interviewed B.A. in the Urbina home after he was discovered locked in a room. Karla was there for a visit when Russell arrived and informed Russell that B.A. was placed in this foster home. CSW Tanya Russell stated to Karla that no foster children are shown in this facility. CSW Tanya Russell searched the home and found B.A locked in a room. CSW Russell took no action with regard to B.A. 's illegal placement. Instead, CSW Russell contacted the assigned Defendant supervisor (SCSW) on B.A.'s case because Urbina was ill and on her way to the hospital. The Defendant

SCSW agreed with CSW Russell that B.A. should remain in Urbina's [unlicensed, undocumented] home with Penelope, the daughter in law involved in the domestic violence investigation [Contact Log [44, 45/55]

111.   The same Defendant SCSW who instructed CSW Russell to leave B.A. in the Urbina home with Penelope, also instructed Defendant CSW Escobedo to remove B.A. from Penelope on 7-21-15 and transport him to the home of a family friend, Josephina Rendon 4542 E. 53rd Street, Bell, Cal. Of note, Rendon was previously fingerprinted and approved. B.A., however, was not placed with Rendon or removed from Urbina on 7-21-15.

112.   On 7-24-15, Martha Urbina was the caregiver who signed for B.A. to receive medical care with appointment at Azul Medical Clinic Dean Ferdows, M.D. 4316 E. Slauson Ave, Maywood, Cal. 323)773-2020. [See Azul Medical Records].)

113.   On 7-31-15, Defendant CSW Escobedo falsified a detailed face to face contact with B.A. and Renford at 4542 E. 53rd Street in the contact log which did not occur because B.A. resided with unlicensed Urbina at 6251 ½ Mayflower in Bell, Cal. 90201. [Contact Logs 46/55] This contact log entry was falsified to cover up/conceal the fact that B.A. remained placed, and unsupervised in an unlicensed facility.

114.   On 7-31-15, Defendant CSW Escobedo forged the signature of Josefina Rendon on a "Relative Caregiver Agreement" for the purported placement of B.A. with Rendon at 5623 E. 53rd Street that never occurred. Rendon did not sign this agreement nor reside at 5623 E. 53rd Street. The true facts are that Rendon resided on 4542 E. 53rd Street, at all times herein. Defendant CSW Escobedo forged the "Relative Caregiver Agreement" to conceal B.A.' s unsupervised and undocumented placement in an unlicensed home.

115.   On 8-5-15, Defendant CSW Escobedo falsified a second face to face contact with B.A. at 4542 E. 53rd Street (Rendon's address) in the contact log to further conceal B.A.'s unsupervised and undocumented placement in the unlicensed home of Urbina at 6251 ½ Mayflower in Bell, Cal. 90201. [Contact Logs 46/55].

116.   On 8-13-15, Nancy Lopez, Defendant County Dept. of Mental Health, conducted a psychological evaluation of B.A. and filed a Psychological Examination Form documenting her evaluation in the dependency court file.

117.   On 8-14-15, Defendant CSW Ruben falsified a third face to face contact with B.A. at 4542 E. 53rd Street (Rendon's address) in the contact log to further conceal B.A.'s unsupervised and undocumented placement in the unlicensed home of Urbina at 6251 ½ Mayflower in Bell, Cal. 90201. [Contact Logs 46/55].

118.   On 8-19-15, Defendant CSW Escobedo falsified a' fourth detailed face to face contact with B.A. and Renford at 4542 E. 53rd Street in the log that purportedly occurred the next day - 8-20-2015. B.A. was not placed at 4542 E. 53rd Street on 8-19-15. He remained unsupervised with unlicensed Urbina at 6251 ½ Mayflower in Bell, Cal. 90201. [Contact Logs 51 and 52/55]

119.   On 8-20-15, Defendant CSW Ruben Jimenez and Defendant SCSW Rachel Simons filed a false jurisdiction/disposition report that stated on page 1 that B.A. was currently placed with Rendon at 4542 E. 53rd Street. B.A. was residing with Urbina on 8-20-15. This was further concealment of B.A.' s unsupervised and undocumented placement in the unlicensed home of Urbina.

120.   On page 9 of the jurisdiction/disposition report, Defendant CSW Jimenez reported that Defendant conducted a face to face visit with B.A. and Karla at Rendon's home located at 4542 E. 53rd Street on 8-14-15. This is false. B.A. was residing with Urbina on 8-20-15. This was further concealment of B.A. ' s unsupervised and undocumented placement in the unlicensed home of Urbina. Defendant CSW Ruben Jimenez and Defendant SCSW Rachel Simons indicated that B.A. was assessed on 8-13-15 by Nancy Angeles Lopez LSCW of Los Angeles County Department of Mental Health, 2629 Clarendon. This assessment was also documented on the Psychological Examination Form signed by Lopez and maintained in chart at the County Department of Mental Health.

121.   In 2017, however, when Karla requested B.A.'s records from DMH, she

was informed by Silvia Rowe Record Keeper, Record Keeper Supervisor, San Antonio Family Center 2629 Clarendon Ave., 2nd Floor, Huntington Park, California 90255, that "[A]fter a thorough search of our records, we are returning the request because client has not been seen at this clinic in the time specified." As alleged hereinabove, B.A. 's evaluation and treatment by the Mental Health Department was clearly established by (1) the Psychological Examination Form signed by Lopez on 8-13-15 and (2) the jurisdiction/disposition report filed on 8-20-15 that informed the court that B.A. was evaluated at the County Dept of Mental Health by Nancy Lopez on 8-13-15. B.A.'s DMH chart will show that on 8-13-15, Urbina was B.A.'s authorized caretaker and B.A. was placed with Urbina at 6251 ½ Mayflower, not Rendon.

122.   On 8-19-16, Defendant CSW Evita Salas and Defendant SCSW Antonia Lopez filed a Status Review Report that informed the court: "On 07/08/2015 a referral was submitted to DMH Specialized Foster Care program. On 07/30/2015, B.A. was successfully linked to San Antonio Mental Health clinic located at 2629 Clarendon Ave., 2nd Floor; Huntington Park, CA 90255; 3230584-3700. On 08113/2015 and (sic) initial intake and assessment was completed for B.A. with Nancy Angeles- Lopez, LCSW, Psychiatric Social Worker." As alleged above, in a letter dated September 12, 2017 to Karla, Silvia Rowe, stated the following: "After a thorough search of our records, we are returning the request because client has not been seen at this clinic in the time specified."

123.   On page 10 of the Status Review Report, Defendant Evita Salas and Defendant SCSW Antonia Lopez informed the court that, "[O]n 08/31/2015, the therapist was informed B.A. was exhibiting feelings of sadness and difficulties concentrating due to not being able to live with his mother. Therapist agreed to meeting with B.A. again, but had difficulty scheduling appointment due to caregiver having a death in her family. The true facts are that the "caregiver having a death in her family" is Urbina. Rendon did not have a death in her family until October 2015.

124.   On page 10 of the Status Review Report, Defendant Evita Salas and Defendant SCSW Antonia Lopez stated, "The court is respectfully referred to the

11/02/2-16 DMH letter from San Antonio Mental Health Center". Italics in the original. Defendants further informed the court that, "[O]n 10/22/2015, the therapist met with Bryan and his caregiver Josefina Rendon." This is false. Rendon never met therapist Lopez.

125.    On page 10 of the Status Review Report, Defendant Evita Salas and Defendant SCSW Antonia Lopez stated, "[F]or current case, B.A. was detained on 06/18/2015 and replaced twice on 06/29/2015 and 07/2112015." This is false. B.A. was placed with unlicensed Urbina on 6-29-15; he was placed with Josefina Rendon on 10-1-15. There was no placement on 7-21-2015. On the placement agreement dated 7-31-2015 purportedly for B.A.' s placement on 7-21-2015 with Rendon at the wrong address, Defendant Escobedo forged Rendon's signature.

126.    On page 10 of the Status Review Report, Defendant Evita Salas and Defendant SCSW Antonia Lopez further stated, "[A]s of7/21/2015, B.A. has been placed in the Non Relative home of caregiver Josefina Rendon." Defendant Evita Salas and Defendant SCSW Antonia Lopez further stated, "This placement continued to be appropriate for B.A. The caregiver is meeting the child B.A. 's basic needs by providing food, shelter, clean clothing, medical and dental care. B.A. is thriving and doing well and had reported he likes the home of the caregiver Josefina Rendon, but hopes to reunify with his parents."

127.    This report is false. B.A. was placed with unlicensed Urbina on 6-29-15 and with Josefina Rendon on 10-1-15. There was no placement on 7-21-2015.

128.    Specifically, on 9-7-15, Urbina was the care giver who signed for B.A.'s medical treatment with Dean Ferdows, M.D. 4316 E. Slauson Ave, Maywood, Cal. 323)773-2020.

129.    On 9/25/15, Urbina signed for B.A.'s treatment with Dr. Foster as the authorized care giver with whom B.A. resided during the time period Defendants repeatedly misrepresented to the court in numerous documents, in contact logs, and in forged placement agreements that Rendon was B.A' s foster mother.

130.   On "9-31-15", Defendant CSW Escobedo forged Rendon's signature for a second time on a "Foster Parent Needs and Services Summary" purportedly signed and dated by Josefina Rendon. The date that both Rendon and Defendant purportedly signed this document does not exist. There are only 30 days in September. Josefina did not sign nor date this document. Notably, Defendant CSW Escobedo correctly checked the "Replacement" box at the top of the Summary consistent with the true facts that Defendant Escobedo did replace B.A with Rendon from Urbina on 10-1-15, not 7-21-15, as misrepresented to the court repeatedly.

131.   B.A. remained with Urbina until 10-1-15 when he was placed with family friend, Josefina Rendon. Rendon's three adult children, as well as her neighbors, friends, and relatives, have personal knowledge that B.A. was not placed with Rendon until 10-1-15 as opposed to 7-21- 2015. In addition, Urbina transported B.A. to medical and dental appointments until 9-25-15. Medical records of Dr. Foster and Dr. Ferdows document that B.A. was placed with Urbina through 9-23-15.

132.   B.A. remained with Rendon until removed on 10-11-16 based on allegations falsified by Defendant CSWs that Rendon allowed B.A. to reside with Karla and Alfredo for three months in violation of court orders thereby putting B.A. at serious risk of physical harm.  During B.A.'s placement in Urbina's home, he was subjected to maltreatment, abuse and violence. Just twelve years old, he was repeatedly sexually abused by a woman (Urbina) more than forty years his senior.

133.   On 10-14-16, Defendant CSW Evita Salas and Defendant SCSW Antonia Lopez filed a perjured detention report that swore they interviewed Rendon at her home; that Rendon stated B.A. had resided with Karla and his father for the past three months; that they walked with Rendon to Karla's house where they found B.A. alone with Karla; that Karla and Alfredo failed to address domestic violence.

134.   On 10-14-2016, CSW Jimenez filed a perjured petition that Rendon failed to comply with the court order in that she allowed Karla and Alfredo to have unlimited and unmonitored contact with B.A., that Rendon's failure endangers Bryan's physical

health and safety, and places B.A. at risk of serious physical harm, damage and danger.

135.   The true facts are that Rendon complied with all court orders. B.A., did not reside with his parents based on dozens of eye witnesses. The Defendant CSW did not interview Rendon because she was not at her home. Rendon and B.A. were at Karla's for dinner on a supervised visit.

136.   B.A. was interviewed by Defendant and stated that he did not live with his mother. Rendon's adult children, relatives, and neighbors and children corroborated that B.A was living with Rendon when he was removed, not Karla nor did B.A. have unmonitored visits with Karla or Alfredo.

137.   On 10-14-16, Defendant CSW Jimenez filed a WIC 387 petition under penalty of perjury that swore Rendon failed to comply with the court order in that she allowed Karla and Alfredo to have unlimited and unmonitored contact with B.A. in violation of the court order that endangers B.A.'s physical health and safety, and places Bryan at risk of serious physical harm, damage and danger. This is false.

138.   On 11-30-16, Defendant CSW Gloria Mejia, Defendant SCSW Stephanie Morales, and Defendant SCSW Laura Luna filed a false jurisdiction/disposition report. Defendants misrepresented on page 10, that Josefina Rendon allowed Karla and Alfredo to have unmonitored access to B.A. in violation of court orders. On page 11, Defendants stated that B.A. said he never had unmonitored contact with his parents and did not live with them. On page 12, Defendants misrepresented that Karla admitted to having unmonitored contact with B.A. On page 16, Defendants reported that on 7-8-2015, B.A. was referred to DMH Specialized Foster Care Program, that on 7-30-15, B.A. was "successfully linked to San Antonio Mental Health Clinic located at 2629 Clarendon Ave., 2nd Floor. Huntington Park, CA 90255; 323-584-3700, that on 8- 13-1\216 (sic) an initial intake and assessment was completed for B.A. by Nancy Angeles-Lopez, LCSW, Psychiatric Social Worker. Based on the assessment B.A. was reported he presented with no symptoms or behavioral issues and did not meet medical necessity."

139.   Thereafter, DCFS placed B.A. in a series of foster homes where he was

abused, neglected, starved, and forced by his social worker and foster mother, to take adult psychotropic meds without a court order or food would be withheld. In 2016, B.A. went AWOL repeatedly to escape severe abuse and neglect. He threatened to remain AWOL unless and until he was released to his mother where he was safe, never abused or neglected.

140.   In May 2017, Karla filed a WIC 388 petition requesting the court to reinstate family reunification for B.A. and to order B.A. 's release to her custody. Defendant CSWs informed the court that DCFS would approve said petition to reunify B.A. and his mother.

141.   On 6-15-17, Defendant Gloria Mejia and Defendant SCSW Irma Silva filed a WIC 366.26 report. On page 6, Defendants stated, "[S]ince 08/18/2005, Bryan has had five placements in which he was replaced four times on 06/29/20015,07/2112015, 10/1112016 and 10118/2016 .... On 07/21115 B.A was placed in the Non Relative home of caregiver Josefina Rendon ... ". This is falsified evidence. B.A. was placed with unlicensed Urbina on 6-29-15; there was' no placement on 7-21-2015, B.A. was placed with Josefina Rendon on 10-1-15.

142.   On page 7 of the WIC 366.26 report, Defendant Gloria Mejia and Defendant SCSW Irma Silva stated that, "At this time mother has filed a 388 petition to reinstate FR services ... Due to mother's compliance with court orders and case plan, DCFS will approve the request .... Due to mother's compliance, DCFS used discretion to liberalize visits. Mother has been picking up B.A. on Friday and returning him to his placement on Sundays. Visits have gone with no incident. Child reports to being happy with his mother ... On May 10, 2017, mother filed a 388 petition to reinstate FR services. DCFS has requested to advance and vacate this court hearing to allow child to return home of parent-mother."

143.   B.A. was released to Karla's care on 10-9-2-17. Jurisdiction terminated on October 12, 2017.

144.   There is no record of any contact or supervision with B.A. other than during

the investigation of the domestic violence with Urbina and her son by CSW Russell who interviewed B.A. in the Urbina home on 7-21-15. More than twelve CSWs created a seamless web of deception to conceal/cover up B.A.'s placement for three months in the unlicensed home of violent Urbina.

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – FOURTH AMENDMENT
### (By Minor Plaintiff B.A. against COUNTY OF LOS ANGELES,
### MELISSA RAMIREZ, LYDIA BUENO,
### ALEXANDRA RONCES, and DOES 1- 10)

145.   Plaintiffs repeat, re-allege and incorporate all paragraphs, as though fully set forth herein.

146.   Defendant County's and Defendant DCFS' s standard operating procedure to use perjury to detain and traffic children into foster care in violation of civil rights, Penal Code §§ 115, 118, and 8 *U.S.C.* §1621, for federal foster care funds under Title IV E of the Social Security Act, is so widespread, a practice so permanent and well settled as to constitute a custom or usage with the force of law inferred from the following facts: (1) enactment of Government Code § 820.21 in 1995 to remove social worker immunity for perjury and cover up based on Legislative findings of widespread perjury, cover-up and coercion, statewide, including Defendant County; (2) numerous tort claims, complaints, and civil lawsuits against Defendant County and Defendant DCFS based on perjury and cover-up since 1995 and enactment of § 820.21 and; (3) hundreds of parents who will attest to the use of perjury and cover up by Defendant County and Defendant CSD to secure removal of their children.

147.   Defendant Ramirez and Defendant Bueno seized B.A. from Plaintiffs custody based on substance abuse that Defendants knew was false. Defendant Ramirez and Defendant Bueno falsified SDM Assessments in violation of MPP 31-001, 31-135, and *Penal Code* § 115 to maintain custody of minor Plaintiff B.A. for federal foster care funds. Defendants were driven by Defendant DCFS' aforesaid standard operating

procedure to deprive/violate Fourth Amendment rights to obtain federal foster care funds by committing perjury.

148.    Defendant Ramirez and Defendant Bueno also falsified the Detention Report, the Addendum, and the SDM Assessments, to continue to deprive/violate Plaintiff B.A. 's constitutional rights under the Fourth Amendment, as well as those rights under applicable California law rising to the level of a constitutionally protected right.

149.    It should have been apparent to a reasonable CSW that no circumstances existed to seize and detain B.A. lawfully by the use of perjury that would deprive B.A. of his Fourth Amendment rights. Defendant Ramirez and Defendant Bueno followed Defendant DCFS' standard operating procedure and seized B.A. deliberately, intentionally, and with reckless or callous indifference to B.A. 's rights and safety, thereby justifying the awarding of punitive damages only in an amount commensurate with the nature of the Defendant's wrongful conduct and the amount of Defendant's wealth.

150.    As a direct and proximate result of Defendant Ramirez' and Defendant Bueno's intentional, malicious, oppressive, deprivation/violation of Minor Plaintiffs Fourth Amendment rights, Minor Plaintiff suffered, and will continue to suffer physical, mental, and emotional injury, all to an extent and in an amount subject to proof at trial. Minor Plaintiff has also incurred and will continue to incur, attorneys fees, costs and expenses, including those authorized by 42 *U.S.C.* Section 1988, to an extent and in an amount subject to proof at trial.

151.    Plaintiffs specifically allege that Defendant County's employees' actions, customs, and/or practices, as described herein, were within the control of Defendant County and within the feasibility of Defendant County, to alter, adjust, and/or correct so as to prevent some or all of the unlawful acts and injury complained of herein by Plaintiffs.

/ / /

## SECOND CLAIM FOR RELIEF

## VIOLATION OF CIVIL RIGHTS 42 U.S.C. § 1983

## MUNICIPAL LIABILITY (*MONELL*)

### (By Minor Plaintiff B.A. against COUNTY OF LOS ANGELES)

152.   Plaintiffs repeat, re-allege and incorporate all paragraphs, as though fully set forth herein.

153.   Defendants County and DCFS violated Plaintiffs' constitutional rights, as alleged *supra*, by creating and maintaining the following unconstitutional customs and practices, *inter alia*:

    i.    Defendant County's and Defendant DCFS' standard operating procedure to use perjury to detain and traffic children into foster care in violation of their civil rights, Penal Code §§ 115, 118, and 8 US.C. §1621 for federal foster care funds under Title IV E of the Social Security Act, is so widespread a practice so permanent and well settled as to constitute a custom or usage with the force of law;

    ii.    Defendant County's and Defendant DCFS' maintaining a policy of detaining and/or removing well cared for children from parental custody based on falsified declarations and falsified SDM Assessments in violation of MPP 31-001, 31-135, and *Penal Code* section 118;

    iii.    Defendant County's and Defendant DCFS' maintaining a policy of removing and detaining well cared for children from their parents and not returning them beyond a reasonable period after the basis for detention is negated;

    iv.    Defendant County's and Defendant DCFS' failing to train, supervise and discipline its officers, agents, employees, and state actors, regarding providing and/or failing to provide the Constitutional protections guaranteed to individuals, including those under the

Fourth and Fourteenth Amendments when performing actions related to child abuse and dependency proceedings.

v.   According to the 1995 Legislative Digest, Defendant County and Defendant DCFS social worker perjury has been a defining issue in dependency court proceedings statewide for over twenty (20) years. In 1995, the Legislature held statewide hearings leading to enactment of *Government Code* Section 820.21 to curb the use of perjury and false evidence by removing immunity from civil liability allowing parents and children to hold social workers accountable. The Legislature documented numerous complaints of widespread use of perjury in dependency court proceedings by social workers. The Legislature also documented that the majority of the parents on advice of counsel, pled no contest to perjured child abuse allegations leaving the perjury unchecked and rubber-stamped by "unwitting" hearing officers. The Legislature further found hearing officers ordered well cared for children into foster care based on unchecked perjury without a trial.

154.   Despite Defendant County's awareness of its practice of the use of perjury since at least 1995 with the enactment of Gov 't Code section 820.21 and continuing thereafter based on the millions of dollars paid to children and parents in civil judgments, that it needed to address these issues and properly train its employees, Defendant County and its employees continue to engage in the permanent, widespread, and settled custom of perjured declarations, perjured petitions, perjured detention reports, false jurisdiction/disposition reports, and false evidence, which led to the deprivation of Plaintiffs' constitutional rights.

155.   Defendant County and Defendant DCFS, owed duties to Plaintiffs at all times to establish, implement and follow policies, procedures, customs, and/or practices which confirm and provide for the protections guaranteed under the United States

Constitution, including the Fourth and Fourteenth Amendments; to use reasonable care to select, supervise, train, control, and review the activities of all of their agents, officers, employees and those acting under them, including with DCFS; and further, to refrain from acting with deliberate indifference to the Constitutional rights of Plaintiffs herein so as to not to cause them the injuries and damages alleged herein.

156.   Plaintiffs specifically allege that Defendant County's policies, customs, and/or practices, as described herein, were within the control of Defendant County and within the feasibility of Defendant County, to alter, adjust, and/or correct so as to prevent some or all of the unlawful acts and injury complained of herein by Plaintiffs.

### THIRD CLAIM FOR RELIEF
### VIOLATION OF CIVIL RIGHTS 42 U.S.C. § 1983
### FOURTEENTH AMENDMENT
**(By Minor Plaintiff B.A. against COUNTY OF LOS ANGELES, MELISSA RAMIREZ, LYDIA BUENO, ALEXANDRA RONCES, OFFICER PACHECO, OFFICER ESPINOZA, and DOES 1- 10)**

157.   Plaintiffs repeat, re-allege and incorporate all paragraphs, as though fully set forth herein.

158.   On 6-15-15, Defendant CSW Melissa Ramirez filed a false Request for Removal Order. Defendant swore there was probable cause to believe that continuance in the home of the parents is contrary to B.A.' s welfare, when there was no cause.

159.   On 6-18-2015, Defendant CSW Melissa Ramirez and Defendant SCSW Lydia Bueno, seized B.A. from Karla's custody based on the 6-3-2015 falsified police report that drugs were found in Karla's bathroom and that Alfredo lived in the home.

160.   It should have been apparent to Defendant CSW Melissa Ramirez and Defendant SCSW Lydia Bueno that deliberate falsification of evidence in a child abuse investigation violated Plaintiff's B.A.'s constitutional rights resulting in deprivation of Plaintiffs Fourth Amendment rights against unreasonable seizure and B.A.'s, Karla's, and Alfredo's Fourteenth Amendment rights not to be separated without due process of law

except in emergencies *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.Ed 1101,1107 (9th Cir. 2001) (citing *Stanley v. Illinois*, 405 U.S. 645, 651, 93 S. T.1208).

161.   Defendants knew or should have known that Plaintiffs had familial relationships that their actions would impair.

162.   Defendants' acts and/or omissions as alleged in throughout this entire complaint constituted interference with and/or deprivation of Plaintiffs' familial relationships and/or association and were thus violations of Plaintiffs' Fourteenth Amendment Rights to Due Process of Law.

163.   Further, Defendant CSW Melissa Ramirez and Defendant SCSW Lydia Bueno acted with knowledge that Plaintiffs would and did suffer immediate and serious trauma from forced separation, physical, mental and emotional distress, and acted deliberately, intentionally, and with reckless or callous indifference to Plaintiffs' fundamental protected rights under the Fourteenth Amendment to the U. S. Constitution. Defendants' conduct was intentional outrageous, oppressive, malicious and justifies the awarding of punitive damages.

164.   On 6-23-2015, Defendant CSW Melissa Ramirez and Defendant SCSW Lydia Bueno filed a perjured detention report that "[t]he family is not an intact family as it consists of mother Karla Garcia (26) and her son B.A. (sic) Aranda (12). Mother and father are not together. Father Alfredo Aranda (40) has monitored visits with the child B.A."

165.   Defendant CSW Melissa Ramirez and Defendant SCSW Lydia Bueno fabricated evidence in the detention report of drugs found in Karla's bathroom which they knew was false.

166.   It should have been apparent to Defendant CSW Melissa Ramirez and Defendant SCSW Lydia Bueno that deliberate falsification of the detention report violated Plaintiffs' Fourteenth Amendment rights. No reasonable social worker would believe that circumstances existed to file a perjured detention report.

SECOND AMENDED COMPLAINT          -36-

167.   Defendant CSW Melissa Ramirez and Defendant SCSW Lydia Bueno acted with knowledge that Plaintiffs would and did suffer immediate and serious trauma from forced separation, physical, mental and emotional distress, and acted deliberately, intentionally, and with reckless or callous indifference to Plaintiffs' fundamental protected rights under the Fourteenth Amendment to the U. S. Constitution. Defendants' outrageous conduct justifies the awarding of punitive damages only in an amount commensurate with the nature of the Defendant's wrongful conduct and the amount of Defendant's wealth and exemplary damages in an amount to be determined at time of trial.

168.   On 6-23-2015, Defendant CSW Ronces filed a perjured Welf & Inst Code section 300 petition that directly and materially contradicted the detention report filed the same day by Defendant CSW Melissa Ramirez and Defendant SCSW Lydia Bueno. In the WIC 300 petition, Defendant Ronces swore Karla and Alfredo resided in the home in violation of court orders and Karla thereby created substantial risk of serious physical harm. The true facts are set forth in the detention report, "[t ]he family is not an intact family as it consists of mother Karla Garcia (26) and her son B.A. (sic) Aranda (12). Mother and father are not together. Father Alfredo Aranda (40) has monitored visits with the child B.A."

169.   It should have been apparent to Defendant CSW Ronces that deliberate falsification of the WIC 300 petition violated Plaintiffs' Fourteenth Amendment rights. No reasonable social worker would believe that circumstances existed to file a perjured WIC 300 petition in dependency court.

170.   Defendant CSW Ruben Jimenez and Defendant SCSW Rachel Simon filed a' falsified Jurisdiction/Disposition report on 8-20-2015 to maintain custody of minor Plaintiff B.A. for federal foster care funds.

171.   It should have been apparent to Defendant CSW Ruben Jimenez and Defendant SCSW Rachel Simon that deliberate falsification of the Jurisdiction/Disposition report violated Plaintiffs' Fourteenth Amendment rights. No

reasonable social worker would believe that circumstances existed to file a falsified Jurisdiction/Disposition report in dependency court.

172.   Defendant Evita Salas and Defendant SCSW Antonia Lopez filed a false status report and a perjured detention report to maintain custody of minor Plaintiff B.C. for federal foster care funds on 8-19-2015.

173.   It should have been apparent to Defendant Evita Salas and Defendant SCSW Antonia Lopez that deliberate falsification of a status review report violated Plaintiffs' Fourteenth Amendment rights. No reasonable social worker would believe that circumstances existed to file a false status review report in dependency court.

174.   On 10-14-2016. Defendant Evita Salas and Defendant SCSW Antonia Lopez filed a perjured detention report removing B.A. from Josefina Rendon's custody.

175.   It should have been apparent to Defendant Evita Salas and Defendant SCSW Antonia Lopez that a perjured detention report violated Plaintiffs' Fourteenth Amendment rights. No reasonable social worker would believe that circumstances existed to file a perjured detention report in dependency court.

176.   On 11-30-2016, Defendant CSW Gloria Mejia, Defendant SCSW Stephanie Morales and Defendant Laura Luna filed a falsified jurisdiction /disposition report to maintain custody of minor Plaintiff B.A. for federal foster care funds.

177.   It should have been apparent to Defendant CSW Gloria Mejia, Defendant SCSW Stephanie Morales, and Defendant Laura Luna that deliberate falsification of the jurisdiction /disposition report violated Plaintiffs' Fourteenth Amendment rights driven by Defendant County's and Defendant DCFS's aforesaid long standing official policies and practices. No reasonable social worker would believe that circumstances existed to file a falsified jurisdiction /disposition report in dependency court.

178.   Defendant CSW Gloria Mejia's, Defendant SCSW Stephanie Morales', and Defendant Laura Luna's execution of Defendant County's and Defendant DCFS's aforesaid official policies and practices caused deprived/violated of Plaintiffs' fundamental rights to family privacy protected by the First and Fourteenth Amendments

SECOND AMENDED COMPLAINT                    -38-

to the U.S. Constitution.

179.   Additionally, as alleged with particularity herein, Defendants filed a perjured application for a protective custody warrant, falsified SDM Assessments, falsified petitions and detention reports, status review reports, falsified contact logs, and repeated forgery.

180.   It should have been apparent to a reasonable CSW that the use of perjury and deception in dependency proceedings in violation of MPP 31-001, 31-135, and Penal Code § 115, that led to B.A.'s two year forced separation, would have deprived Plaintiffs of due process rights to be free from deception dependency proceedings.

181.   Moreover, procedurally, on every occasion upon which the reauthorization and/or reapproval of the requirement that B.A. not be allowed to return home to his parents, a separate and additional violation of due process occurred.

182.   As a direct, legal and proximate result of Defendants' aforementioned intentional, malicious, and oppressive conduct, Plaintiffs have suffered and continue to suffer great emotional pain and injury, as well as loss of comfort, society and support all in an amount to be determined according to proof at trial.

183.   Plaintiffs specifically allege that Defendants' complained of acts and/or omissions, were within each of their control, and within the feasibility of each of them, to alter, adjust, and/or correct so as to prevent some or all of the unlawful acts and injury complained of herein by Plaintiffs.

## FOURTH CLAIM FOR RELIEF

## NEGLIGENCE

**(By Minor Plaintiff B.A. against COUNTY OF LOS ANGELES, RUBEN JIMENEZ, MELISSA RAMIREZ, LYDIA BUENO, ALEXANDRA RONCES, GLADYS ESCOBEDO, EVITA SALAS, ANTONIA LOPEZ, RACHEL SIMONS, GLORIA MEJIA, STEPHANIE MORALES, ILANA LARA, LAURA LUNA, SANDRA JIMENEZ, and DOES 1-10)**

184.   Plaintiffs repeat, re-allege and incorporate all paragraphs, as though fully

1  set forth herein.

2      185.   This claim is brought pursuant to California state law.

3      186.   Each of plaintiffs' state law claims arise from the same nucleus of operative

4  fact as the claims in this Complaint based upon federal law and all the claims are so

5  closely related that this Court may properly exercise its Supplemental Jurisdiction over

6  the state law claims.

7      187.   Defendants, and each of them, owed Plaintiff B.A. a duty of reasonable care

8  to avoid exposing him to reasonably foreseeable risks of harm or injury by acting

9  reasonably under the circumstances complained of in this Complaint.

10     188.   Defendants, and each of them, breached their duty of reasonable care during

11  the incidents complained of in this Complaint, by failing to act reasonably under the

12  circumstances.

13     189.   As a direct, legal and proximate result of the aforementioned conduct,

14  Plaintiff has suffered and continues to suffer great emotional pain and injury, as well as

15  loss of comfort, society and support all in an amount to be determined according to proof

16  at trial.

17     190.   As to each state law claim herein, Plaintiffs specifically allege that

18  Defendants' complained of acts and/or omissions, were within each of their control, and

19  within the feasibility of each of them, to alter, adjust, and/or correct so as to prevent

20  some or all of the unlawful acts and injury complained of herein by Plaintiffs.

21     191.   As to each state law claim herein, Defendant County is liable to Plaintiffs

22  for the acts of its public employees, for conduct and/or omissions herein alleged,

23  pursuant to the doctrine of Respondeat Superior, codified at California Government

24  Code § 815.2.

25  / / /

26  / / /

27  / / /

28

## FIFTH CLAIM FOR RELIEF

## NEGLIGENCE PER SE: VIOLATION OF CALIFORNIA DEPARTMENT OF SOCIAL SERVICES MANUAL OF POLICY AND PROCEDURE DIVISION 31-001,31-135,31-320.3,31-330,31-401.5, & CALIFORNIA STRUCTURED DECISION MAKING 3.0 SAFETY AND RISK ASSESSMENTS

**(By Minor Plaintiff B.A. against COUNTY OF LOS ANGELES, RUBEN JIMENEZ, MELISSA RAMIREZ, LYDIA BUENO, ALEXANDRA RONCES, GLADYS ESCOBEDO, EVITA SALAS, ANTONIA LOPEZ, RACHEL SIMONS, GLORIA MEJIA, STEPHANIE MORALES, LAURA LUNA, SANDRA JIMENEZ, and DOES 1-10)**

192.   Plaintiffs repeat, re-allege and incorporate all paragraphs, as though fully set forth herein.

193.   By its express provisions, California Department of Social Services (CDSS) Manual of Policies and Procedures, (MPP) Division 31 CHILD WELFARE SERVICES PROGRAM, CHAPTER 31-000 GENERAL REQUIREMENTS, imposes mandatory statutory duties on Defendant County, Defendant CDS, and Defendant social workers, as follows: GENERAL 31-001 provides in pertinent part: ".1 The requirements specified in Sections 31-005 through 31-525 shall be met by the county in the administration of child welfare services."

194.   The CDSS Manual of Policies and Procedures (MPP) Division 31-135, imposed mandatory statutory duties on Defendant County, Defendant CDS, and Defendant social workers to "**ensure**" that "**authority**" to remove B.A. exists prior to removal as follows: "When a social worker determines that the child cannot be safely maintained in his/her own home, the social worker must ensure that authority to remove a child exists prior to removal".

195.   The clear Legislative intent of MPP Division 31-135 to "ensure that authority" exists prior to removal is to prevent the unnecessary removal to protect the

fundamental liberty interests in maintaining the parent-child relationship and fundamental independent liberty interest to be part of a family unit.

196.   MPP Division 31-320.2 imposed mandatory statutory duties on Defendant County, Defendant DCFS, and Defendant social workers, to visit the child three times during the first 30 days in foster care to ensure safety and fundamental liberty interests.

197.   MPP Division 31-320.3 imposed mandatory statutory duties on Defendant County, Defendant DCFS, and Defendant social workers, to visit the child monthly in foster care to ensure safety and fundamental liberty interests.

198.   MPP Division 31-330 imposed mandatory statutory duties on Defendant County, Defendant DCFS, and Defendant social workers, to have monthly contacts with the care provider, to ensure the safety and fundamental liberty interests of foster children are protected.

199.   MPP Division 31-401.5 imposed mandatory statutory duties on Defendant County, Defendant DCFS, and Defendant social workers, to place children in an appropriate licensed or approved facility to ensure the safety and fundamental liberty interests of foster children are protected.

200.   MPP Division 31-410. 52 imposed mandatory statutory duties on Defendant County, Defendant DCFS, and Defendant social workers, to temporarily place children in an appropriate licensed or approved facility to ensure the safety and fundamental liberty interests of foster children are protected.

201.   The CDSS Structured Decision Making System (SDM), Policy and Procedures Manual SDM 3.0 October 2015, imposed mandatory duties on Defendant social workers to complete the SDM Safety and Risk Assessments on each referral and in that process, only mark conduct as a risk if the information reaches the definition for an item set forth in the SDM Definitions as follows: "Step II APPROPRIATENESS OF A CHILD ABUSEINEGLECT REPORT FOR RESPONSE. A. Screening Criteria, "Based on the caller's concerns, mark all criteria that apply. Do not mark items if the caller's information does not reach the definition for an item." (emphasis added, Policy

and Procedures Manual SDM 3.0, p. 30).

202.   In this case, the information concerning "domestic violence" and "substance abuse" did not meet the definition of a safety threat/risk as defined in the SDM Hotline Definitions, SDM Safety Assessment Definitions, or SDM Risk Assessments. That said, Defendants falsified the SDM Safety and Risk Assessments to manufacture a risk as "authority" to remove B.A. in blatant violation of mandatory statutory duties imposed by MPP 31-001 and 31-135.

203.   Minor Plaintiff B.A. is within the class to be protected from seizure without "authority" in violation of MPP 31-001, 31-135 and suffered the kind of injury MPP 31-001, 31- 135, were enacted to prevent: removal from parental custody from 6-29-2015 to 10-9-2017 without "authority" under Section 31-135 as defined in the statutory SDM Definitions.

204.   DCFS placed Minor Plaintiff B.A. in an unlicensed facility from 6-29-2015,to 10-1-2015 unsupervised, in violation of mandatory duties imposed by MPP Division 31-320.2, MPP Division 31-320.3, MPP Division 31-330, MPP Division 31-401.5, MPP Division 31-410.52.

205.   Minor Plaintiff B.A. is within the class to be protected from illegal placement in (an unlicensed facility in violation of 31-41 0.5 and 31-410.52 and suffered the kind of injuries 31- 410.5 and 31-410.52 were enacted to prevent: placement with an unlicensed caregiver.

206.   Minor Plaintiff B.A. is within the class to be protected from lack of visits and supervision the first month and monthly visits thereafter, and suffered the kind of injuries MPP Division 31-320.2, MPP Division 31-320.3, MPP Division 31-330, were enacted to prevent: placement with an unlicensed caregiver.

207.   As a direct and proximate result of Defendants' violation of mandatory duties imposed by MPP 31-001 and 3-135, MPP Division 31-320.2, MPP Division 31-320.3, MPP Division 31-330, 31-410.5 and 31-410.52, Minor Plaintiff, B.A. suffered forced separation for two years, and will continue to suffer physical!, mental, and

emotional injury, all to an extent and in an amount subject to proof at trial. Defendant County and its entity DCFS are vicariously responsible under Government Code Section 815.21 and other applicable statutory and case law.

### SIXTH CLAIM FOR RELIEF
### VIOLATION OF MANDATORY DUTY
**(By ALFREDO ARANDA and Minor Plaintiff B.A. against COUNTY OF LOS ANGELES, DCFS, RUBEN JIMENEZ, MELISSA RAMIREZ, LYDIA BUENO, ALEXANDRA RONCES, GLADYS ESCOBEDO, EVITA SALAS, ANTONIA LOPEZ, RACHEL SIMONS, GLORIA MEJIA, STEPHANIE MORALES, LAURA LUNA, SANDRA JIMENEZ, and DOES 1-10)**

208.   Plaintiffs repeat, re-allege and incorporate all paragraphs, as though fully set forth herein.

209.   As detailed above, SDM 3.07, MPP 31-001, 31-135, 31-320.3, 31-330, 31-401.5, CDFS Policy 0070-502.10 and 300-303.15, WIC §§ 16000(a) and 202, Health & Safety Code § 1508, and Penal Code §§ 115 and 118 are enactments. Enactments form the basis of a mandatory duty under California Government Code § 8l5.6.

210.   These statutes apply to all members of the general public, including plaintiffs, and were all designed to prevent the kind of injuries alleged herein.

211.   Defendants did not exercise reasonable diligence in discharging their duty to refrain from violating the statutory rights of plaintiffs.

212.   As a direct and proximate cause of the aforementioned acts of defendants, plaintiffs were damaged in amounts to be determined at trial.

### SEVENTH CLAIM FOR RELIEF
### BANE ACT
**(By PLAINTIFF B.A. against OFFICER PACHECO, OFFICER ESPINOZA, and DOES 1-10)**

213.   Plaintiffs repeat, re-allege and incorporate all paragraphs, as though fully set forth herein.

214.   This claim is brought pursuant to California state law.

215.   All defendants, and each of them, by doing and/or causing the acts complained of in this entire Complaint, violated Plaintiff's civil rights per California Civil Code Sections 52.1 and 52(b) by doing the acts described herein above. Each act and/or violation of rights done by each Defendant to Plaintiff B.A. was done by way of threats, intimidation and/or coercion beyond that inherent in each act and/or violation of rights itself because, *inter alia,* each act was additionally a violation of personal rights under Cal. Civ. Code §43. There were also multiple coercive acts.

216.   Entity and/or agency defendants are liable to plaintiff for the acts of their public employees, the individual defendants herein, for conduct and/or omissions herein alleged, pursuant to the doctrine of Respondeat Superior, codified at California Government Code § 815.2.

217.   Defendants, and each of them, for the respective acts and violations pleaded herein above, are liable to each Plaintiff for damages, and penalties and attorneys' fees as provided in California Civil Code §52(b), including but not limited to an amount no less than $25,000 to Plaintiff, per each Defendant, per each violation of right, in addition to all other remedies supported by or provided for by law.

218.   Defendants, and each of them, for the respective acts and violations pleaded herein above, are liable to Plaintiff for attorneys' fees as provided in California Civil Code § 52(b)(3).

219.   Defendants, and each of them, for the respective acts and violations pleaded herein above, are liable to Plaintiff for damages, penalties and attorneys' fees as provided in California Civil Code § 52.1(b).

220.   All allegations made throughout this entire complaint, from paragraph 34 through 220, inclusive, are made upon information and belief of plaintiffs, and each of them.

## PRAYER

1.   **WHEREFORE**, Plaintiffs, and each of them, pray for the following relief

from Defendants, and each of them, for each of the above causes of action:

    (i)    For compensatory damages, including general and special damages, as well as incidental damages, according to proof;

    (ii)    For punitive damages pursuant to 42 U.S.C. §§1983, 1988 and any other applicable laws or statutes, in an amount sufficient to deter and make an example of each non-governmental entity Defendant;

    (iii)    For statutory damages and/or civil penalties, according to proof,

    (iv)    For prejudgment interest according to proof;

    (v)    For reasonable attorney fees pursuant to 42 U.S.C. §§ 1983, 1988; and any other applicable federal law provisions;

    (vi)    For reasonable attorneys' fees pursuant to California Civil Code §§ 52.1, 52(b)(3), CCP §1021.5and any other applicable state law provisions;

    (vii)    For costs of suit; and

    (viii)    For such further relief which is just and proper.

Dated: October 29, 2019        Respectfully Submitted,

                                ORANGE LAW OFFICES, P.C.

                                LAW OFFICE OF RACHEL STEINBACK

                                HADSELL STORMER RENICK & DAI LLP

                                By:   /s/ Brian Olney
                                      Brian Olney
                                Attorneys for Plaintiffs

## JURY DEMAND

Plaintiffs hereby demand a trial by jury in this action.

Dated: October 29, 2019

Respectfully Submitted,

ORANGE LAW OFFICES, P.C.

LAW OFFICE OF RACHEL STEINBACK

HADSELL STORMER RENICK & DAI LLP

By: ___/s/ Brian Olney_____
Brian Olney
Attorneys for Plaintiffs